[Cite as *In re L.W.J.*, 2014-Ohio-4181.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: L.W.J. and J.J. | : | APPEAL NOS. C-140282 |
| | | C-140283 |
| | : | |
| | | TRIAL NO. F12-220Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  September 24, 2014

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Ronald Geers*, Assistant Prosecuting Attorney, for Appellant Hamilton County Department of Job and Family Services,

*Megan Busam*, Attorney Guardian Ad Litem, for Appellants L.W.J. and J.J.,

*Elizabeth Powers Mitts*, Attorney Guardian Ad Litem, for Appellee Mother,

*W. Edward Clore*, for Appellee Mother.

Please note:  this case has been removed from the accelerated calendar.

**HILDEBRANDT, Judge.**

{¶1} The Hamilton County Department of Job and Family Services ("HCJFS") appeals the juvenile court's judgment denying it's motion for permanent custody of L.W.J. and J.J. ("the children") and granting permanent custody of the children to their mother, the appellee. The guardian ad litem ("GAL") for the children also appeals the juvenile court's judgment awarding permanent custody to the mother. Because the mother failed to complete court-ordered substance-abuse and mental-health treatment and failed to secure independent, permanent housing that was appropriate for the children, we reverse the juvenile court's judgment denying HCJFS's motion for permanent custody.

### Facts

{¶2} The mother had two children, L.W.J. who was born on February 7, 2008, and J.J. who was born on March 27, 2009. The children were removed from the mother's home in June 2011 because of the deplorable and unsafe living conditions. Because of the condition of the home, the mother was charged with and convicted of child endangerment in August 2011. She was placed on community control, and ordered to complete parenting classes and to report for random toxicology screens. The children were placed with a maternal aunt under a safety plan. On December 15, 2011, the mother moved in with the aunt, but two weeks later, the aunt said that the mother and children could no longer stay with her. On December 30, 2011, the mother signed a voluntary agreement placing the children in the interim custody of HCJFS.

{¶3} In February 2012, the children were adjudicated dependent and neglected. At the dependency hearing, the mother stipulated to the following facts: the house that the mother and children had been living in was "deplorable and not safe for children to remain in the home"; the outside of the house was structurally unsound and there was furniture littering the property; there was trash all over the inside of the home, with medication bottles lying within the reach of the children; there was molded food on the table, crawling with roaches; there was no edible food in the refrigerator, only dead roaches and roach droppings; there were roaches crawling over the food in the cabinets; there was black mold in the bathrooms; and the carpet in the house was so dirty, it was almost black.

{¶4} Following the dependency hearing, HCJFS was awarded temporary custody of the children. The juvenile court then ordered the mother to complete a previously scheduled diagnostic assessment and follow through with any recommended services. Further, the mother was ordered to "comply with random drug screens," "obtain and maintain sobriety," "successfully complete parenting classes," "attend [supervised] visits" and "obtain and maintain stable appropriate housing and income." The visits were supervised because the mother had arrived at one visit under the influence of "something" and smelling of marijuana.

{¶5} At the review hearing in May 2012, HCJFS reported that the mother remained without appropriate housing, and had missed multiple visits with the children as well as the scheduled diagnostic assessment. The court again ordered the mother to obtain appropriate stable housing, attend visits and complete parenting classes. But the mother missed most of the visits in July and August 2012, and tested positive for cocaine in June 2012, and for marijuana in July 2012. Eventually, the

mother completed the diagnostic assessment, and she was diagnosed with depressive disorder, cannabis dependence, alcohol abuse and borderline intellectual functioning. It was recommended that the mother attend individual therapy and receive substance-abuse treatment.

{¶6} The mother consistently visited with the children in October and November 2012. In December 2012, the court ordered the mother to complete "outpatient substance abuse treatment," continue to visit the children, and obtain and maintain stable housing and income.

{¶7} Three months later, in March 2013, the court was notified that the mother had been terminated from services for substance-abuse and mental-health treatment because of her failure to comply with the programs. The mother had also been terminated from the parenting program at Beech Acres because she had failed to complete the parenting coach session. The mother was also still living in the home from which the children had been removed. The HCJFS caseworker reported that the mother had been referred to another program for substance-abuse and mental-health treatment and that the intake was scheduled soon. The court ordered the mother to attend that intake appointment, visit the children every week and look at housing options.

{¶8} In July 2013, the mother's attorney asked for a GAL to be appointed for the mother because she was having difficulty understanding the legal proceedings. A GAL was appointed.

{¶9} Eventually, HCJFS moved to modify its temporary custody of the children to permanent custody. Darrell Walton, the maternal grandmother's fiancé, also filed a petition for custody of the children. Walton and the maternal

grandmother had been approved to visit with the children, and had been doing so with the mother in recent months. A permanent-custody hearing was held in October and November 2013.

**Permanent-Custody Hearing**

{¶10} At the permanent-custody hearing, HCJFS presented the testimony of Candace Baird, an HCJFS caseworker. Baird testified that HCJFS was seeking permanent custody of the children because: (1) the children had been out of the mother's care since June 2011; (2) the mother had been unable to find permanent appropriate housing; and (3) the mother had refused to complete the services offered to her for parent coaching and substance-abuse and mental-health treatment. Baird testified that the mother refused to complete the services because she felt that she did not need those services. Baird testified that although the mother had been visiting the children consistently for the past six months and was affectionate and loving with them, one month prior to the permanent-custody hearing, the mother had told Baird that she did not want custody of the children and instead wanted the children's maternal grandmother to have custody. The mother also self-reported that she was still using drugs as of September 2013.

{¶11} Baird noted that the mother had not moved out of the house she had been living in with the children until it had been condemned. When that occurred, the mother had moved into the house where Walton and the children's maternal grandmother lived. She had only been living there one month at the time of the permanent-custody hearing.

{¶12} Finally, Baird testified that the children had been living with the same foster family since being placed in the care of HCJFS. The foster parents had been

taking the children to speech services, doctor appointments and school. The foster parents had bonded with the children and wanted to adopt them.

{¶13} Laura Rudolph-Young, the HCJFS employee who had completed the home study for Walton and the maternal grandmother, testified that the house itself was appropriate for the children to inhabit. But she was concerned about Walton's past domestic-violence history with women other than the maternal grandmother. And she was also concerned about the grandmother's history with the children's service agency. Apparently, the mother and her siblings had been removed from grandmother's care so grandmother did not raise the mother. Despite these concerns, Rudolph-Young noted that Walton did have custody of his three children, and that he had lived with grandmother for six years and there had been no reports of domestic violence.

{¶14} Antoinette Atar Cottingham testified for HCJFS. She is currently an employee with HCJFS, but had previously worked at Beech Acres Parenting Center where the mother was ordered to attend parenting classes. Cottingham testified that the mother was hard to get in touch with, and did not successfully complete the parenting course at the time that Cottingham worked at Beech Acres.

{¶15} Walton testified that he had custody of his biological children and that he wanted custody of the mother's children. He testified he was bonded to them and that he had an appropriate house. He also indicated that the mother was living with him "until she gets a place."

{¶16} The mother presented the testimony of Zach Vargo, the visitation supervisor at the Family Nurturing Center ("FNC") where visits between the mother and the children had occurred. Vargo testified that for the previous two months, the

mother's attendance had been almost perfect, and that during the visits, the mother was engaged with the children and the children seemed happy to see her. He also testified that the mother had recently been able to redirect the children's bad behavior and that, although he had initially had concerns about the mother's "mental and emotional issues," he had not had those concerns recently.

{¶17} On cross-examination, Vargo conceded that the visits between the mother and the children occurred in a very controlled environment with several staff members present.

{¶18} Although the children's GAL did not testify, in her report she recommended that HCJFS be awarded permanent custody of the children because of the mother's lack of participation in the services offered. The children were too young at the time of the report to express their wishes. The GAL noted that the children had bonded with their foster family.

{¶19} Following the hearing, the court denied Walton's petition for custody, denied HCJFS's motion for permanent custody, terminated HCJFS's temporary custody of the children and remanded custody of the children to the mother with orders of protective supervision to HCJFS. The orders of supervision were that the mother must (1) continue to live with Mr. Walton and the maternal grandmother; (2) comply with random drug screens, and if any screen is positive, then immediately engage in substance-abuse treatment; (3) maintain sobriety; and (4) engage in family therapy with the children. The court noted that the orders of protective supervision terminated on December 9, 2014.

{¶20} In awarding custody to the mother, the court focused on the mother's good visits with the children at FNC. The court noted that although the mother's

lack of follow through on mental-health and substance-abuse treatment was concerning, HCJFS had failed to show how these concerns prevented the mother from "parenting." Nevertheless, the court noted that the orders of protective supervision addressed the concerns the court had regarding the mother's lack of engagement in treatment.

{¶21} HCJFS and the children's GAL filed objections to the court's decision. While the objections were pending, the children's GAL filed a review report in April 2014, indicating that the oldest child was in kindergarten and that he had expressed that he wanted to live with "Nana," his foster mother.

{¶22} Following a hearing on the objections, the juvenile court overruled the objections and adopted the magistrate's decision remanding custody to the mother. In its decision, the court noted that although the mother "has untreated mental health and substance abuse issues" and that her "borderline functioning, her lack of income, her marijuana use and her mental health issues likely contributed to her acceptance of past living in squalor with her children," the mother "now lives with the maternal grandmother and Mr. Walton" and that "[i]f the mother remains there, the physical conditions of the prior house and cleanliness concerns that originally led to the removal of the children will be relieved." The court also noted that there was not a "sufficient nexus of the mother's drug use or mental health to the detriment of these children."

## Appeal

{¶23} HCJFS, asserting a single assignment of error, and the children's GAL, asserting two assignments of error, appealed the juvenile court's decision. Collectively, the assignments challenge the juvenile court's determination that it was

in the best interest of the children to deny HCJFS's motion for permanent custody and instead, remand custody to the mother.

{¶24} A juvenile court is authorized to terminate parental rights and to grant permanent custody to a children services agency if it finds by clear and convincing evidence that one of the four conditions enumerated in R.C. 2151.414(B)(1)(a) through (d) has been met and that the children's best interest would be served by a grant of permanent custody to the agency. *See* R.C. 2151.414(B); *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 48.

{¶25} R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a children services agency if (a) the child is not abandoned or orphaned and has not been in agency custody for 12 months, but cannot be placed with either parent within a reasonable time or should not be placed with either parent, (b) the child is abandoned, (c) the child is orphaned and no relatives are able to take permanent custody, or (d) the child has been in the temporary custody of one or more children services agencies for 12 months of a consecutive 22-month period.

{¶26} Below, it was undisputed that the children had been in the temporary custody of HCJFS for 12 months of a consecutive 22-month period, so the condition under 2151.414(B)(1)(d) has been satisfied. Thus, the only issue before the juvenile court, when considering the objections to the magistrate's decision denying permanent custody to HCJFS, was what was in the best interest of the children.

### Best Interest

{¶27} In assessing the best interest of a child, the court must consider "all relevant factors," including (1) the child's interaction with parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may

significantly affect the child, (2) the wishes of the child, as expressed by the child or the child's guardian ad litem, (3) the custodial history of the child, (4) the child's need for legally secure placement and whether that type of placement can be achieved without a grant of permanent custody, and (5) whether any of the factors under R.C. 2151.414(E)(7) through (11) apply. R.C. 2151.414(D)(1)(a)-(e).

{¶28} After reviewing the record, we hold that there was clear and convincing evidence that it was in the children's best interest to grant permanent custody to HCJFS, and thus, that the juvenile court erred by denying HCJFS's motion for permanent custody and remanding custody to the mother.

{¶29} Initially, we note that none of the factors set forth under R.C. 2151.414(E)(7) through (11) apply. Therefore, we only consider the first four factors in the best-interest analysis set forth above.

### The children's relationships with others and their wishes

{¶30} The record demonstrates that although the mother eventually began to visit more consistently with the children and that she had progressed somewhat in parenting skills, the fact remained that any parenting by the mother took place in a well-controlled environment with members of FNC present to assist. All of the mother's interaction with the children took place under the highest form of supervision; there was no in-home visitation or overnights with the children. And there could not have been because the mother chose not to move out of the house that the children had been removed from due to its deplorable living conditions. There was also evidence presented that the mother was affectionate with the children at visitations and was bonded with them, yet one month before the permanent-

custody hearing, she had told the HCJFS caseworker that she did not want custody of the children.

{¶31}  Further, the evidence showed that the children were bonded with their foster parents, who took good care of the children and wanted to adopt them.  At the time of the permanent-custody hearing, the children were too young to express their wishes, but in a recent GAL report submitted to the court the oldest child expressed a desire to live with the foster parents.

### Custodial History

{¶32}   The children have been out of the mother's care since June 2011, and had been in the care of HCJFS for almost two years when the permanent-custody hearing occurred.

### Legally Secure Placement

{¶33}  There was clear and convincing evidence that it was not possible to obtain a legally secure placement for the children without a grant of permanent custody to HCJFS.  The mother had untreated mental-health and substance-abuse issues and refused to seek treatment, even after being ordered to do so by the juvenile court.  The mother had also been ordered to obtain and maintain an income, but the record is unclear as to whether the mother had done so.  The mother failed to find appropriate, permanent housing for the children during the two years that the children were in the temporary custody of HCJFS.  She only moved from the home that the children had been removed from because the house was being condemned.  At that point, one month before the permanent-custody hearing, she moved in with the maternal grandmother and Walton, but Walton testified that that living arrangement was only temporary.  There was never any evidence presented that the

mother could provide appropriate, permanent housing for the children in the future, and, as noted above, she certainly had not done so in the past. And it seems highly unlikely, given the mother's failure to participate in mental-health and substance-abuse treatment, that the mother will find appropriate, permanent housing in the future—the juvenile court even found that the mother's untreated substance-abuse and mental-health issues "likely contributed to her acceptance of past living in squalor with her children."

{¶34} Considering that the mother had not remedied the reason why the children had been removed from her care, that she had refused to obey court orders to participate in substance-abuse and mental-health treatment, and had told the HCJFS case worker one month prior to the permanent-custody hearing that she did not want custody of the children, it is apparent that a legally secure placement for the children is only possible with a grant of permanent custody to HCJFS.

### Sufficient Nexus Not Required

{¶35} In its decision, the juvenile court acknowledged but disregarded the mother's lack of compliance with the court's orders to complete substance-abuse and mental-health treatment, because HCJFS had not shown "a sufficient nexus of the mother's drug use or mental health to the detriment of these children." But HCJFS was not required to show that the mother's mental-health and substance-abuse issues during the reunification process adversely affected the children. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 84-85. HCJFS is only required to demonstrate that a parent's mental condition actually interferes with the parent's ability to provide adequate care for the child in the adjudicatory phase when HCJFS is seeking a finding of dependency under R.C. 2151.04(B). This

requirement is not applicable where HCJFS has previously been awarded temporary custody of the children and is now seeking permanent custody. *Id.*

{¶36} Nevertheless, the fact that the mother remained in the home the children had been removed from for "deplorable living conditions" instead of seeking permanent, appropriate housing for the children was competent, credible evidence demonstrating that the mother's untreated issues kept her from providing adequate care for the children.

{¶37} Based on the foregoing, we hold that the juvenile court's finding that it was not in the best interest of the children to grant permanent custody to HCJFS was against the manifest weight of the evidence. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. The juvenile court erred by denying HCJFS's motion for permanent custody and remanding custody to the mother. Accordingly, we sustain the three assignments of error, and remand this cause to the juvenile court with instructions to grant HCJFS's motion for permanent custody.

Judgment accordingly.

CUNNINGHAM, P.J., and Hendon, J., concur.


Please note:
The court has recorded its own entry on the date of the release of this opinion.