[Cite as *In re J.G.S.*, 2019-Ohio-802.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: J.G.S.　　　　　　　　　: 　　APPEAL NOS. C-180611
　　　　　　　　　　　　　　　　　　　　　　　 C-180619
　　　　　　　　　　　　　　: 　　TRIAL NO. F16-1954Z

　　　　　　　　　　　　　　: 　　　*O P I N I O N.*


Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 8, 2019


*Christopher P. Kapsal*, for Appellant Father,

*John Treleven*, for Appellant Mother,

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Donald D. Clancy, II*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of  Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Robert Adam Hardin*, Assistant Public Defender, Guardian ad Litem for J.G.S.

**MOCK, Presiding Judge.**

{¶1}   Mother and father appeal the decision of the Hamilton County Juvenile Court granting permanent custody of their child, J.G.S., to the Hamilton County Department of Job and Family Services ("HCJFS"). We find no merit in their assignments of error, and we affirm the juvenile court's judgment.

{¶2}   The record shows that on August 26, 2018, HCJFS filed a complaint seeking temporary custody of J.G.S. and his two siblings, R.G.S. and P.G.S. The family had an extensive history with HCJFS. Immediately prior to the filing of the complaint, the agency had received reports that father was verbally threatening the children, the home was hazardous, and the children were dirty and unkempt. The complaint further alleged that the children had been left unsupervised and that incidents of domestic violence had occurred.

{¶3}   Subsequently, all three children were found to be dependent. The court returned custody of P.G.S. to mother and father, with protective supervision. The oldest child, R.G.S., had substantial mental-health issues and was placed in a group home. J.G.S. was placed in foster care. HCJFS filed a reunification plan that included provisions for family therapy, individual therapy for the parents, medical cards, parenting education, vouchers for clothing, food and transportation, and supervised visitation.

{¶4}   J.G.S. had numerous medical issues. He had been involved with the Complex Care Center at Children's Hospital Medical Center since 2012. His diagnoses included cerebral palsy, scoliosis, seizure disorder, growth hormone deficiency, left-side paralysis, visual impairment, hearing loss, and leg deformities. At the time of the filing of the complaint, he was nonverbal, he could not walk well, and he was dependent on a feeding tube.

{¶5}   J.G.S. was also diagnosed with "failure to thrive." He was "small and thin" and not big enough to register on a growth chart. At times, he would gain

2

weight, but then he would lose what he had gained. Those losses usually correlated with the "ups and downs of the family's problems."

{¶6} The family's problems were caused by frequent housing moves, changing schools, lack of appropriate housing and utilities, and family chaos. All three children lacked proper hygiene, which was due to a lack of hot water and other utilities in the home. The parents' report of J.G.S.'s food intake was not consistent with his failure to gain weight. Further, the parents did not consistently get J.G.S. to his physical therapy and other appointments, citing transportation problems and other issues. J.G.S. could walk with a walker. He needed to use his walker to increase strength and mobility, but the parents allowed him to scoot around on the floor.

{¶7} While in HCJFS's custody, J.G.S. gained weight and made substantial progress. He improved his ability to walk and to communicate. Mother and father attended his appointments, they were cooperative with the physical therapist, and they were able to assist J.G.S. with his exercises.

{¶8} For the most part, the parents complied with the provisions of the reunification plan. Eventually, legal custody of their oldest child, R.G.S, was returned to them. R.G.S. was supposed to attend a residential jobs program, but he did not do so before he turned 18 and aged out of the juvenile system. Further, P.G.S., the child who had earlier returned to parents' custody, failed to regularly attend school and had numerous unexcused absences.

{¶9} On January 25, 2018, HCJFS filed a motion for permanent custody of J.G.S. Evidence presented at a hearing on that motion showed that although the parents had engaged in services and attended appointments, they had failed to demonstrate any of the skills or coping mechanisms necessary to parent a child with substantial medical needs. They continued to blame medical professionals and others for J.G.S.'s failure to thrive while in their care, and took no responsibility for that failure to thrive. They lacked insight and understanding about his medical

needs, and they were not able to maintain the level of stability that J.G.S. would need.

{¶10} Pamela Hudson, J.G.S's physical therapist, testified about her treatment goals for J.G.S. She stated that after he was placed in foster care, J.G.S. had started to make tremendous progress towards those goals. At the time of the hearing, she was working with him on climbing stairs. J.G.S. had made some progress, but he could not safely climb stairs all the time. Hudson also said that he needed a caregiver who could provide a home free of clutter so that he could safely practice using his walker and other exercise equipment. He needed a first-floor bathroom, as a sense of urgency would make him less stable if he had to climb stairs to access a bathroom.

{¶11} Hudson acknowledged that mother and father had always been willing to work with her, and since J.G.S had been removed from the home, they had been consistent in attending appointments. She saw father working with J.G.S. on using stairs and walking with his walker. She stated that he was appropriate in those activities. When Hudson prescribed new exercises for J.G.S., Hudson saw mother help perform those exercises. She further stated that mother and father were open to those changes.

{¶12} Vera Gosse, a social worker from the Complex Care Center, testified about her interactions with the family before custody of J.G.S. was awarded to HCJFS, including the family's failure to make appointments, housing problems, and domestic violence. She also discussed how the hospital had reenrolled J.G.S. in programs with the Hamilton County Department of Developmental Disabilities ("DDS"), after the family had let that enrollment lapse. DDS arranged for the family to receive services from the Community Integrated Training and Education Agency ("CITE"), a program that provides in-home services.

{¶13} According to Gosse, mother and father declined services from CITE. They stated that the family's problems were out of their control. They blamed their

problems on everyone else and reported frustrations with service providers. But the service providers had problems contacting the family due to multiple moves and a failure to maintain phone contact. Further, J.G.S.'s treatment was complex, and the parents did not seem to recognize how the chaos in their home had contributed to his failure to thrive.

{¶14} Prior to J.G.S. entering foster care, the family had continuing financial concerns and problems maintaining housing, utilities, phones and transportation. J.G.S. had a plug-in feeding pump, which was affected by interruptions in power due to disconnected utilities. The hospital tried to help the family with housing, but they had issues with landlords not maintaining the property. Further, the children argued with the neighbors, which led to father being arrested and a protection order issued requiring father to stay away from the landlord and his family.

{¶15} After the family lost its housing voucher, they moved every four to six months, for a total of five times in three years. The moves interfered with services, and transportation had to be set up, which led to conflict between the family and the school. Mother and father did not want to send J.G.S.'s electrical feeding pump to school. The pump was essential to optimize his caloric intake on a regular basis. Eventually, the hospital provided a second feeding pump and extra formula to the school.

{¶16} J.G.S. will require life-long specialized care. After he turns 21 years of age, he will join the adult health-care system. Because the parents required two to four reminder calls to ensure their compliance with appointments, the hospital was concerned that J.G.S.'s needs would not be met once he enters the adult system. After J.G.S. started having seizures, he was prescribed medication. The hospital later learned that the parents did not pick up the seizure medication for several days, leading to more seizures.

{¶17} Melanie Jarmon, a caseworker with HCJFS, had seen the home that the family was living in at the time of the permanent-custody hearings. She said that

all of the bedrooms were on the second floor, and there was a bathroom on the second floor and in the basement. There were stairs up to the house's entrance and to the second floor. Though J.G.S. had started to climb stairs, he needed a supportive person to hold his stability harness and to walk beside him. He also needed rails, but if rails were added, there would not be room for a supportive person to help him.

{¶18} The parents said that they would turn one of the first-floor rooms into J.G.S.'s bedroom and get a portable toilet that they would clean and sterilize after each use. But J.G.S would still have to go upstairs to bathe, which caused concern given the children's previous lack of hygiene.

{¶19} Jarmon also testified that although the parents reported that they had cleared spaces for J.G.S. to walk, there was still a lot of clutter throughout the home. There was limited space for J.G.S. to walk, and no room for exercise equipment. Further, Jarmon had concerns that the parents' medical issues would preclude then from providing the amount of physical support that J.G.S. would need.

{¶20} Violence in the home remained a concern. Father stated that R.G.S., who had turned 18, was not living in the home. But Jarmon stated that he had been present when she had visited the home. He was supposed to take medication for his mental-health issues, but he did not take it, and was often violent as a result. Shortly before the hearing on permanent custody, father called 911 because R.G.S. was throwing rocks and a bottle, and father had thrown a stick at R.G.S.

{¶21} Father testified on his own behalf. He stated that he loved J.G.S. and wanted him back home. Father explained the problems the family had had with finances, housing and jobs. Although the family had been evicted five times in the three years previous to the hearing, he had no housing concerns at the time because he worked for the landlord, and the family had lived in the home for almost a year. He detailed the family's efforts to make the house suitable for J.G.S., including creating a first-floor bedroom for him and obtaining a chemical toilet for him to use.

{¶22} After hearing all the evidence, the magistrate granted HCJFS's motion for permanent custody. Both mother and father filed objections to the magistrate's decision. The trial court overruled the objections and adopted the magistrate's decision. These appeals followed.

{¶23} We begin our analysis with father's assignments of error, which we address out of order. We note that in his objections to the magistrate's report, father only argued the weight and sufficiency of the evidence. He did not specifically raise the issues he argues under his second and third assignments of error. "An objection to a magistrate's decision shall be specific and state with particularity all grounds for the objection." Juv.R. 40(D)(3)(b)(ii). Because father failed to raise those issues in his objections, he has waived all but plain error. *See In re Jones*, 1st Dist. Hamilton Nos. C-090497, C-090498 and C-090499, 2010-Ohio-3994, ¶ 31-33.

{¶24} In his second assignment of error, father contends that the trial court erred in relying on "a factual record developed prior to the case coming into juvenile court to determine the child's custody status." He argues that because the court improperly relied on "pre-adjudicatory" evidence to make its decision to award permanent custody to HCJFS, the court's decision should be reversed. Essentially he argues that court should not have admitted evidence regarding the events that caused J.G.S. and his siblings to be removed from the home. This assignment of error is not well taken.

{¶25} Father relies on R.C. 2151.414(A)(1), which provides that "[t]he adjudication that the child is an abused, neglected, or dependent child * * * shall not be adjudicated at the [permanent-custody] hearing and shall not be affected by a denial of the motion for permanent custody." This prohibition does not preclude the court from considering evidence elicited in the dependency or neglect hearing at a permanent-custody hearing. *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014 and CA2015-07-015, 2016-Ohio-640, ¶ 62; *In re Nice*, 141 Ohio App.3d 445, 454, 751 N.E.2d 552 (7th Dist.2001).

> The prohibition is merely an attempt to emphasize that the outcome of the permanent custody hearing has no effect on the prior adjudication of abuse and neglect or the prior order of temporary custody, meaning that the parent cannot "erase" past findings of neglect by defending the agency's motion for permanent custody.

*Nice* at 454.

{¶26} Father also contends that the doctrine of res judicata applies. R.C. 2151.353(F)(1) provides that the juvenile court retains jurisdiction over any child for whom it has issued an order of disposition until the child reaches age 18 or age 21, if the child has a developmental disability or physical impairment. Other appellate districts have held that because the juvenile court is vested with continuing jurisdiction to review and, if necessary, modify its dispositional orders, res judicata does not prohibit the litigation of issues relative to a motion for permanent custody even though the same or similar issues may have been considered in a prior action under R.C. Chapter 2151. *In re Stephens*, 7th Dist. Columbiana No. 2001-CA-56, 2002-Ohio-3057, ¶ 25; *In re Ament*, 142 Ohio App.3d 302, 310, 755 N.E.2d 448 (12th Dist.2001); *In re Vaughn*, 4th Dist. Adams No. 00CA692, 2000 WL 33226177, *6-7 (Dec. 6, 2000).

{¶27} Moreover, unlike other types of actions, permanent-custody proceedings require the court to look at the past, present and future when determining the child's best interests and whether the child can be placed with a parent within a reasonable time period. *Stephens* at ¶ 24; *Vaughn* at *6. Under R.C. 2151.414, the court is required to look at all relevant evidence, including a parent's pattern of conduct. *Stephens* at ¶ 27; *Vaughn* at *7. "Some of the most reliable evidence for the court to consider is the past history of children and the parents." *Stephens* at ¶ 27.

{¶28} Evidence of events prior to the removal of the child from the home was relevant to show that the conditions that led to the child's removal continued and

that the child was thriving in his current placement as opposed to when he lived with mother and father. Further, the record does not show that the juvenile court solely relied on evidence that existed prior to the court granting temporary custody to HCJFS. Under the circumstances, we can find no error by the juvenile court, much less plain error. We overrule father's second assignment of error.

{¶29} In his third assignment of error, father contends that the juvenile court erred when it relied on hearsay evidence to make a determination of the child's current custody status. Juv.R. 34(I) provides that the Ohio Rules of Evidence apply in hearings on motions for permanent custody. Father relies on *In re K.G.*, 1st Dist. Hamilton No. C-120772, 2013-Ohio-3160. In that case, this court held that medical records were admissible under the hearsay exception in Evid.R. 803(6) as records of regularly conducted activity. *Id.* at ¶ 9. But we further held that even if the medical records themselves were admissible, the magistrate still should have excluded hearsay statements in those records unless those statements were independently admissible under a hearsay exception. *Id.* at ¶ 11.

{¶30} HCJFS presented excerpts of J.G.S.'s medical records because the complete medical record was 14,000 pages. Father objected to the admission of the excerpts, but he never specified exactly which statements were hearsay, nor did he ask that the hearsay statements be redacted. *See id.* at ¶ 11. In his brief to this court, he has not specified the statements he contends were hearsay.

{¶31} The appellant bears the burden to show error by reference to the record. To be considered on appeal, errors by a trial court must be separately argued and supported by legal authority and citation to the record. App.R. 16(A); *State v. Brown*, 1st Dist. Hamilton No. C-120237, 2013-Ohio-2720, ¶ 24. "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *Brown* at ¶ 24, quoting *State v. Dutiel*, 5th Dist. Perry No. 2012-CA-11, 2012-Ohio-5349, ¶ 38. We decline to go through the excerpts to determine which statements are hearsay.

{¶32} Further, this court has not held that the admission of hearsay statements always requires a reversal. *See In re K.G.*, 1st Dist. Hamilton No. C-120772, 2013-Ohio-3160, at ¶ 14; *In re Kirkland*, 1st Dist. Hamilton No. C-990748, 2000 WL 707169, *2 (June 2, 2000). Here the medical records were cumulative to the testimony of the witnesses. In fact, the magistrate specifically stated that "[t]he evidence, including the medical records * * *, supports the testimony provided by the witnesses." Under the circumstances, father has not shown plain error, and we overrule father's third assignment of error.

{¶33} Finally, in his first assignment of error, father contends that the juvenile court erred in finding that permanent custody was in the child's best interest because that finding was not supported by sufficient evidence and was against the manifest weight of the evidence. Similarly, in mother's sole assignment of error, she contends that the trial court's decision was against the manifest weight of the evidence. These assignments of error are not well taken.

{¶34} R.C. 2151.414(B) provides that the juvenile court may grant permanent custody of a child to a public children services agency if it finds by clear and convincing evidence that (1) permanent custody is in the child's best interest and (2) that one of the conditions in R.C. 2151.414(B)(1) through (e) applies. *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, ¶ 17. The juvenile court found that J.G.S. had been in the custody of HCJFS for more than 12 months of a consecutive 22-month period. Therefore, it found that the condition in R.C. 2151.414(B)(1)(d) had been met.

{¶35} Father contends that since the magistrate "elected to utilize" the condition set forth in R.C. 2151.414(B)(1)(a), the juvenile court was required to find that the child could not be placed with either of his parents within a reasonable time or should not be placed with his parents. Therefore, the court could not rely on the 12-of-22 condition. We disagree.

{¶36} In ruling on objections to a magistrate's report, "[a] court may adopt or reject a magistrate's decision in whole or in part, with or without modification. A court may hear a previously referred matter, take additional evidence, or return a matter to a magistrate." Juv.R. 40(D)(4)(b). The juvenile court was required to make an independent review of the magistrate's decision. The court, after reviewing the transcript of the proceedings before the magistrate, was free to disagree with the magistrate's conclusions and to enter an order it found to be appropriate. *See In re Ross*, 154 Ohio App.3d 1, 2003-Ohio-4419, 796 N.E.2d 6, ¶ 8 (1st Dist.).

{¶37} A child is considered to have entered the temporary custody of an agency on the earlier of the date when the child is adjudicated or 60 days after the removal of the child from the home. R.C. 2151.414(B)(1). The juvenile court found that J.G.S. was originally removed from the home on August 25, 2016, and 60 days after the removal was October 24, 2016. HCJFS filed the motion for permanent custody on January 25, 2018, nearly 15 months after J.G.S. entered temporary custody. Thus, clear and convincing evidence supported the juvenile court's decision that the 12-of-22 condition applied. *See In Re C.E.1*, 1st Dist. Hamilton No. C-140674, 2015-Ohio-5710, ¶ 10.

{¶38} Thus, the only issue remaining was whether granting permanent custody of J.G.S. to HCJFS was in the child's best interest. *See id.* at ¶ 11; *In re L.W.J.*, 1st Dist. Hamilton Nos. C-140282 and C-140283, 2014-Ohio-4181, ¶ 26. The record shows that the trial court considered all the relevant factors in making that determination. *See* R.C. 2151.414(D) and (E); *In re M., R., & H. Children*, 1st Dist. Hamilton No. C-170008, 2017-Ohio-1431, at ¶ 23 and 24.

{¶39} Mother and father obviously love their child and have made efforts to overcome the problems that caused him to be removed from the home. But the dispositive issue is not whether the parents have complied with the case plan, although it is relevant to the extent that it may affect the child's best interest. A parent's compliance with the case plan does not preclude a trial court from awarding

custody to a children services agency, as long as it in the child's best interest. *In re T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 36.

{¶40} Clear and convincing evidence supported the juvenile court's determination granting permanent custody to HCJFS. *See In re M., R., & H. Children* at ¶ 17 and 27. Therefore, the evidence was sufficient to support the award of permanent custody to HCJFS. *See In re A.B.,* 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15.

{¶41} Further, after reviewing the record we cannot hold that the trial court lost its way and created such a manifest miscarriage of justice that we must reverse the judgment and order a new trial. Therefore, the judgment was not against the manifest weight of the evidence. *See Easley v. Volkmann*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *In re A.B.* at ¶ 16. Consequently, we overrule father's first assignment of error and mother's sole assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.


**ZAYAS** and **MYERS, JJ.,** concur.


Please note:

The court has recorded its own entry this date.