[Cite as *In re Z. Children*, 2019-Ohio-1617.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: Z. CHILDREN, C. CHILD | : | APPEAL NO. C-190026 |
| | | TRIAL NO. F16-245z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  May 1, 2019

*James A. Anzelmo,* for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jacqueline O'Hara,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Jessica Moss*, Assistant Public Defender, Guardian ad Litem for minor children,

*Aaren Meehan*, *In re Williams* Attorney for J.Z.1.

**BERGERON, Judge.**

{¶1}  In this parental termination case, Mother comes before us presenting essentially three types of challenges to the underlying result: (1) she procedurally attacks how the hearing unfolded; (2) she raises evidentiary and related issues that speak to the merits of the termination decision; and (3) if her rights are to be terminated, she questions who should receive custody of her children.  After a thorough review of the record and applicable authorities, we conclude that each of these challenges fail, and we accordingly affirm the juvenile court's decision to terminate Mother's parental rights.

I.

{¶2}  This case involves Mother and her three children, J.Z.1, J.Z.2, and J.Z.3.  Hamilton County Job and Family Services ("HCJFS") first came into contact with the family when relatives brought one of Mother's children (not part of this appeal) to Cincinnati Children's Hospital and Medical Center after discovering burn scars on the child's face, wrists, and thighs.  Mother explained that, several days earlier, J.Z.1 had set fire to a pillow while the other child was sleeping on it, causing the burns.  Medical examiners noted that the burns required immediate medical treatment at the time this incident occurred.  In the aftermath of this event, HCJFS received an ex parte order of emergency custody for J.Z.1 and J.Z.2 (as well as the child not part of this appeal).  Within a few months, the court adjudicated both J.Z.1 and J.Z.2 dependent and HCJFS gained temporary custody of the two children in May 2016.

{¶3}  Subsequent to these events, HCJFS offered Mother services including a Diagnostic Assessment of Functioning ("DAF").  During the initial DAF, Mother received a diagnosis of adjustment disorder, but she refused the recommended individual counseling and declined to take a drug screen.  Soon after, HCJFS ordered

another DAF subsequent to Mother testing positive for cocaine while pregnant with J.Z.3. The DAF assessor recommended random drug screens through HCJFS, yet Mother insisted that the cocaine use was only a one-time occurrence. That turned out to be inaccurate, however, as both Mother and J.Z.3 tested positive for cocaine at the time of his birth in July 2016. That prompted HCJFS to secure immediate physical custody of J.Z.3. Mother was then required to complete a third DAF, during which the assessor diagnosed her with "major depressive disorder" and "cocaine use disorder" and recommended outpatient substance-abuse treatment and individual counseling.

{¶4} Following these events, Mother began counseling at the Talbert House, parenting services at Beech Acres, supervised visits with her children at the Family Nurturing Center, and toxicology screens. While aspects of Mother's engagement with these services is under dispute, the record reflects that Mother missed over half of her scheduled appointments with her children (failing to see her children between May 2017 and November 2017), admitted to not engaging in group therapy, refused medication, and tested positive for cocaine on two occasions after discharge from the Talbert House (and subsequently missing numerous drug screens).

{¶5} Moreover, although the children have extensive needs, Mother did not attend a single one of her children's medical appointments, including her oldest child's medical procedure for hearing loss. The youngest, J.Z.3, has two to three appointments per week in physical, swim, and occupational therapy (doctors suspect he has cerebral palsy), and J.Z.2 also must attend weekly physical therapy, both due to medical and sensory issues. The eldest child has a diagnosis of ADHD, PTSD, and ODD, for which he receives medication, and he has severe behavioral issues, which often turn violent. On occasions, he has threatened to kill a foster sibling, acted

3

violently towards his siblings, and set fire to his two-year-old brother's pillow while he was sleeping on it.

{¶6}    In March 2017, J.Z.3 was adjudicated abused, neglected, and dependent and placed in the temporary custody of HCJFS, still residing with the same foster family since his birth.  J.Z.1 and J.Z.2, between February and September 2016, lived with Carolyn Crossty, the aunt of the child not involved in this appeal, and J.Z.2 returned to Ms. Crossty's home in June 2017 until the trial.  Because of J.Z.2's custodial history with Ms. Crossty, HCJFS sought a grant of legal custody of her to Ms. Crossty at trial.  After leaving Ms. Crossty's care, J.Z.1 moved to a foster home, where he remained until trial.

{¶7}    HCJFS eventually moved for permanent custody of J.Z.1 and J.Z.3 and legal custody of J.Z.2 to Ms. Crossty in January 2018.  A few days after HCJFS's filing, the maternal Grandmother filed for permanent custody of J.Z.1 and J.Z.3.  The hearing extended over four days, with the magistrate entertaining testimony from a range of individuals, including Mother's case manager, a Fair Access to Integrated Recovery assessment specialist, the maternal Grandmother, J.Z.3's foster parent, Ms. Crossty, and Mother herself.

{¶8}    The magistrate heard testimony concerning Mother's consistent refusal to partake in group therapy at Talbert House and complete addiction services (both of which Mother admitted to), the countless medical appointments and supervised visits missed (despite being informed of their time and place), her repeated positive drug screens, her current housing problems, and recent unemployment.  Moreover, witnesses testified about the children's litany of special needs, the numerous medical appointments the children have per week, and J.Z.3's potential symptoms of cerebral palsy.  After the hearing, the magistrate granted permanent custody of J.Z.1 and J.Z.3 to HCJFS and legal custody of J.Z.2 to Ms.

Crossty. Upon reviewing the magistrate's decision and hearing Mother and Grandmother's objections, the juvenile court adopted the decision. In wake of this ruling, Mother appeals this order terminating her parental rights, presenting five assignments of error.

II.

{¶9} On appeal, Mother first fashions a procedural argument, challenging the court's decision to hold both the permanent custody and legal custody hearings simultaneously. Yet Mother cites no case law or other authority to support why a separate hearing was necessary in these circumstances. Instead, Mother essentially makes an evidentiary argument, concluding that since the Rules of Evidence apply in permanent custody cases under Juv.R. 34(I) (but not in legal custody hearings), the trial court's decision to allow both the legal custody dispute for J.Z.2 and the permanent custody dispute for J.Z.1 and J.Z.3 to be tried together exposed the permanent custody hearing to the taint of prejudicial hearsay from the legal custody proceedings. Because Mother's fifth assignment of error challenges the admission of hearsay during the hearing, we address her first and fifth assignments of error together.

{¶10} While Mother is correct that, pursuant to Juv.R. 34(I), the "Rules of Evidence shall apply in hearings on motions for permanent custody," the magistrate safeguarded against any potential prejudice, explicitly stating that the court would use the stricter Rules of Evidence as "the higher standard" for both the permanent and legal custody motions. In the absence of any rule or authority precluding convening these proceedings together, we view this as a basic case management decision subject to abuse of discretion review. Because the magistrate took appropriate precautions to safeguard the permanent custody hearing from

prejudicial hearsay, we find no abuse of discretion in the structure of the hearing and accordingly overrule the first assignment of error.

{¶11} Turning to Mother's hearsay argument, she claims the trial court permitted inadmissible hearsay in the hearing through the vehicle of reports from Talbert House and Beech Acres, and that the court improperly relied on these reports to make its parental termination decision. But Mother's brief fails to develop this argument other than simply citing the reports and Evid.R. 801 and 802. In response, HCJFS and the guardian ad litem for the children direct our attention to the business records exception under Evid.R. 803(6).

{¶12} For hearsay to be admissible under the business record exception, the business record must display four essential elements: (1) it must have been kept in the regular course of business; (2) it must stem from a source who had personal knowledge of the acts, events, or conditions; (3) it must have been recorded at or near the time of the transaction; and (4) a foundation must be established by the testimony of either the custodian of the record or some other qualified person. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171 (holding trial counsel did not offer the exhibit as a business record and did not lay the necessary foundation for doing so). A qualified person may lay a foundation if that person has a "working knowledge of the specific record-keeping system that produced the document" and may "vouch from personal knowledge of the record-keeping system that such records were kept in the regular course of business." *State v. Thyot*, 2018-Ohio-644, 105 N.E.3d 1260, ¶ 22 (1st Dist.), quoting *State v. Hirsch*, 129 Ohio App.3d 294, 312, 717 N.E.2d 789 (1st Dist.1998).

{¶13} In this case, Mr. Brock, the case manager, stated the records were from MCP, a program where service providers upload progress notes, treatment recommendations, diagnostic assessments, and discharge summaries. Yet Mr. Brock

did not appear to have a "working knowledge of the specific record-keeping system," nor is he a Talbert House or Beech Acres employee, and he did not purport to lay a foundation for the admissibility of business records here. While HCJFS attached a statement from a Talbert House employee asserting that the records were maintained in the ordinary course of business, the statement was not made under oath. Although the statement attached to the Beech Acres report was notarized, the statement lacked proper foundation, containing nothing about the records being kept in the regular course of business.

{¶14} While we have little doubt that these reports *could* have qualified as business records, the proponents never established the necessary predicates for admissibility, and we will not simply assume away the foundational requirements. Nevertheless, to constitute reversible error, Mother must establish that the hearsay was not harmless error, and here her claim falters.

{¶15} When otherwise inadmissible testimony is cumulative of other evidence in the record, we typically will find its admission to be harmless. *In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, ¶ 32 (declining to reverse based on trial court's use of inadmissible hearsay when the hearsay was cumulative of testimony provided by other witnesses); *In re K.G.*, 1st Dist. Hamilton No. C-120772, 2013-Ohio-3160, ¶ 14 (holding the magistrate's use of inadmissible hearsay as "harmless because it was cumulative of other evidence that appellant knew her son was expected to remain in the hospital").

{¶16} In this case, the trial court's reliance on the Talbert House and Beech Acres reports appears cumulative of other evidence provided at trial, and does not prejudice Mother (indeed, she does not advance a prejudice argument in her brief). Mother herself admitted that she did not attend group therapy and did not complete addiction services. Moreover, based on personal knowledge, the case manager

7

testified that Mother declined to take urine screens, refused medication, and missed numerous appointments at Talbert House. Regardless of the disagreement about whether Mother completed the parenting coaching course at Beech Acres, the admission of inadmissible hearsay at trial constitutes a harmless error, as it largely overlaps with other testimony and evidence provided. Accordingly, we overrule Mother's fifth assignment of error.

III.

{¶17} Turning to the crux of the termination decision, Mother contests the trial court's decision to grant permanent custody of J.Z.1 and J.Z.3 to HCJFS, claiming the decision was not supported by clear and convincing evidence. When reviewing a trial court's decision to grant custody, we must independently "examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the statutory clear-and-convincing standard." *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46.

{¶18} Our review begins upon the foundation that children have a basic right to be raised by their natural family, and because of this right, termination of parental rights is a decision of last resort. When evaluating the propriety of the termination of parental rights, we consider the statutory framework provided in R.C. 2151.414. A juvenile court may grant permanent custody of a child to an agency if the court determines by clear and convincing evidence that (1) permanent custody is in the child's best interest and (2) one of the circumstances provided in R.C. 2151.414(B)(1)(a) through (e) applies. *In re J.G.S.*, 1st Dist. Hamilton Nos. C-180611 and C-180619, 2019-Ohio-802, at ¶ 34. To determine the best interests of the child, the court must consider all relevant factors within R.C. 2151.414(D)(1).

{¶19} Regarding the best interest analysis, Mother spends little time in her brief asserting why the best interests of the children will be served in her custody,

8

noting only in passing that she has gained control over her drug addiction and completed portions of the services. Instead, Mother focuses much of her attention to asserting that the best interests of the children will be served in Grandmother's custody. Because Mother is limited to only challenging the termination of her parental rights, we turn first to the best interests inquiry in regards to Mother.

{¶20} The juvenile court walked through each of the best interest factors, and documented clear and convincing evidence that granting permanent custody to HCJFS was in the children's best interest. To mention a few of the factors that it identified, the juvenile court stressed Mother's lack of commitment to her children. Mother has missed half of her scheduled visits with her children, causing Family Nurturing Center to suspend her visits, and did not visit any of her children between May and November 2017. And, despite being informed of her children's numerous medical appointments regarding their long list of special needs—ADHD, PTSD, sensory issues, hearing loss, and potential cerebral palsy—Mother did not attend one medical appointment during the course of HCJFS's involvement. Mother's drug abuse also causes concern, since Mother routinely tested positive for cocaine, including while pregnant with J.Z.3, and after discharge from Talbert House. *See* R.C. 2151.414(D)(1)(a).

{¶21} While J.Z.1 expressed a desire to be with his mother, he also expressed fear of being abused if he returned home, after witnessing on multiple occasions domestic violence between Mother and different men. And although J.Z.3 is too young to convey his wishes, the GAL took the position that permanent custody was in the best interests of the children. *See* R.C. 2151.414(D)(1)(b).

{¶22} The custodial history of the children was also considered, the juvenile court reiterating that both J.Z.1 and J.Z.3 have been in HCJFS's temporary custody since February 2016, and Mother never progressed past supervised visits. The

juvenile court also mentioned J.Z.3's bond with his foster parents, who wish to adopt him, and who he has lived with nearly since birth. *See* R.C. 2151.414(D)(1)(c). Further, the juvenile court emphasized the children's need for legally secure placement based on Mother's little progress with services, her failure to address her drug use, and the children's special needs (remarking on the numerous appointments her children have per week). *See* R.C. 2151.414(D)(1)(d). The juvenile court also noted the fathers of the children have abandoned their children, as well as Mother on multiple occasions, not seeing her children for over 90 days at time. *See* R.C. 2151.414(D)(1)(e) and (E)(10).

{¶23} Turning to the second half of the analysis, clear and convincing evidence supported that one of the circumstances provided in R.C. 2151.414(B)(1) applied. Both J.Z.1 and J.Z.3 had been in the temporary custody of HCJFS well over 12 months of a consecutive 22-month period at the time of the filing of the relevant motions for permanent custody. *See* R.C. 2151.414(B)(1)(d). Mother does not contest that fact, and we see nothing in the record to call into question the juvenile court's conclusion in that respect.

{¶24} Therefore, we see no grounds to disturb the trial court's determination of the propriety of parental termination and its decision is supported by clear and convincing evidence. Nor can we entertain Mother's alternative argument, that Grandmother should gain legal custody of J.Z.1 and J.Z.3 instead of Mother's parental rights being terminated, because Mother does not have standing to raise this issue on behalf of the nonappealing Grandmother. This court previously dealt with this issue in *In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754, ¶ 9, holding that the father lacked standing because the father had made no arguments challenging the trial court's decision to terminate his parental rights, but only challenged how the trial court's decision affected the rights of the great-

grandmother.  A few years later, we reiterated the point, interpreting *In re T.W.* to mean that "[e]ven if the father had asserted injury to his residual parental rights, we recognized that there was no remedy that we could provide if we found the father's arguments meritorious because the great-grandmother had not appealed from the denial of her custody petition." *In re K.C.*, 2017-Ohio-8383, 99 N.E.3d 1061, ¶ 11 (1st Dist.).

{¶25} In this case, while Mother did challenge the trial court's decision affecting her parental rights, Grandmother did not appeal from the denial of her custody petition, and we cannot assume that she still desires to be awarded custody of J.Z.1 and J.Z.3.  If an affected party (such as Grandmother here) desires that we consider awarding custody to her, she must appeal the decision and assert her rights. For these reasons, Mother does not have standing to raise issues on behalf of Grandmother, and we accordingly overrule Mother's third assignment of error.

IV.

{¶26} In her second and fourth assignments of error, Mother presents essentially remedial questions—who receives custody of the children if she loses.  The first part of this challenge implicates the rights of others, as Mother questions the admissibility of the home study reports of Grandmother and Ms. Crossty, claiming the probative value of the home study reports was "substantially outweighed by the danger of unfair prejudice."  Evid.R. 403(A).  This criticism fails on two fronts—first, the home study reports of Grandmother and Ms. Crossty had probative value to the court in determining whether they would be suitable custodians for the children if the court reached a termination decision.  Nor do the reports (specific to each individual) inflict any prejudice upon Mother, which hints at the second problem for this assignment of error.

11

{¶27} Mother lacks standing to challenge the home study reports because the reports do not emphasize her inability to parent, thereby prejudicing her, but only affect Grandmother and Ms. Crossty's rights—neither one of which appealed in this case. "[A]n appellant cannot raise issues on behalf of an aggrieved third-party, particularly when that party could have appealed the issue to protect his or her own interests." *In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754, at ¶ 9. Since Mother fails to explain why the trial court's decision to admit the home study reports unfairly prejudiced her, she has no standing to challenge the admission of the home study reports, and we accordingly overrule Mother's second assignment of error.

{¶28} Finally, in her fourth assignment of error, Mother claims the juvenile court abused its discretion by giving Ms. Crossty legal custody of J.Z.2. Although the appellees have suggested mootness on this point given subsequent developments in the custodial history, on the record before us we cannot say that the matter is moot. But we also have little hesitation in finding no abuse of discretion here.

{¶29} Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated abused, neglected, or dependent, then a trial court may grant legal custody to a parent or another person who requests custody of the child. The court must consider the best interests of the child, using R.C. 2151.414(D)(1) as guidance. *In re A.C.*, 1st Dist. Hamilton No. C-140273, 2015-Ohio-153, ¶ 6. Here, however, Mother does not contest any of these criteria or findings. Instead, she seems to argue only that custody should have been awarded to Grandmother, and we have already explained above why that argument cannot succeed. Therefore, we cannot find that the juvenile court abused its discretion in granting legal custody to Ms. Crossty, and accordingly overrule Mother's fourth assignment of error.

V.

{¶30} Following our review, we overrule all five of Mother's assignments of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.