[Cite as *State v. See*, 2020-Ohio-2923.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-190251 |
| | | C-190252 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-1706834 |
| | | B-1803242A |
| vs. | : | |
| | | *O P I N I O N.* |
| HERMAN SEE, | : | |
| Defendant-Appellant. | : | |


Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal:  May 13, 2020



*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna,* for Defendant-Appellant.

**CROUSE, Judge.**

{¶1}   This case involves the sexual abuse of three children over the course of 15 years.  The victims were biological or stepdaughters of the defendant-appellant Herman See and his codefendant and girlfriend Angela Stites.  The charges span two indictments and include multiple counts of rape, sexual battery, unlawful sexual conduct with a minor, and gross sexual imposition.  After a jury trial, See was convicted and sentenced to four consecutive life terms, to be served consecutively to 221 years in prison.  He now appeals.

{¶2}   In six assignments of error, See argues that:  (1) the trial court erred in admitting testimony regarding a victim's post-rape psychological issues;  (2) the trial court erred in admitting hearsay testimony;  (3) the convictions were based upon insufficient evidence;  (4) the convictions were against the manifest weight of the evidence;  (5) he was denied effective assistance of counsel;  and (6) his cumulative sentence amounted to cruel and unusual punishment.

### *Factual Background*

{¶3}   See and Stites have a total of six children/stepchildren.  The victims of See's sexual abuse are K.S., S.S., and E.M., who were all children when the abuse occurred, but adults by the time they testified at See's trial.  K.S. is See's biological daughter with Stites.  S.S. is See's biological daughter with another woman.  E.M. is Stites's biological daughter with another man.

{¶4}   The case numbered B-1706834 ("B17") concerned the sexual abuse of K.S.  K.S. testified that See began to abuse her when she was between five and seven years old, which was between 2004 and 2006.  K.S. testified that the abuse usually occurred during the night.  See would take her out of the bedroom she shared with

two of her siblings and take her into his bedroom, where he would perform sexual acts with her, including cunnilingus, fellatio, vaginal intercourse, and digital penetration. She testified that "it happened so often that all the memories are almost all the same." The abuse continued until 2015, when K.S. became pregnant. The father of the baby was her boyfriend, C.D. K.S. eventually moved out of the house and moved in with C.D., at which point she told C.D. about her relationship with See. She testified that she did not realize that what See had been doing was wrong until she talked with C.D. about it. C.D. explained to her that what See had done was rape and sexual abuse, and was not what fathers did to their daughters. K.S. testified that she then disclosed See's abuse to the school resource officer at her school. The case was assigned to Detective Kilby of the Norwood Police Department, who realized during his investigation that K.S.'s sister, E.M., had made similar allegations of abuse against See in 2012.

{¶5} The case numbered B-1803242A ("B18") concerned the sexual abuse of S.S. and E.M. S.S. testified that she would spend summers with See, and the rest of the year with her birth mother, D.S., in Florida. She testified that the first instance of abuse happened in the summer of 2001, when she was approximately eight years old. S.S. testified that See coaxed her into performing fellatio on him in exchange for a lollipop. She testified that during that same incident, See directed E.M. to perform fellatio on him, digitally penetrated E.M., and then directed S.S. and E.M. to digitally penetrate each other. S.S. testified that when she returned to Florida at the end of summer 2001, she told D.S. that See had been "kissing her and touching on her." D.S. called See on the phone and "yelled" at him, and then reported the abuse to police in Florida. S.S. testified that at some point before she was interviewed by

police, she received a phone call from See. He asked her if she "really wanted to put him in prison for the rest of his life." S.S. testified that she was scared, so she told her mother and the police that it had all been a dream. Every summer from 2001, up to and including 2005, S.S.'s mother continued to send her to visit See, and See committed sexual acts with her, including vaginal intercourse. S.S. testified that in the summer of 2005, she returned home to Florida early after telling See that she did not want to have sex with him anymore. She did not stay at See's house again.

{¶6} E.M. testified that she lived with her biological father B.M. and stepmother C.M., but had visitations with See and Stites on weekends and during the summer. E.M. testified that in the summer of 2001 she was three or four years old when See coaxed her and S.S. into performing fellatio on him in exchange for a lollipop. See's sexual abuse was then a regular occurrence whenever E.M. was at his house. When E.M. was asked at trial to estimate how many times See abused her between the ages of seven and ten, she testified, "I couldn't give you a ballpark because it happened so regularly," but, it happened "at least a hundred times."

{¶7} E.M. testified that See first had vaginal intercourse with her when she was 14 years old. She testified that he had vaginal intercourse with her 20-50 times when she was between 14 and 15 years old. The sexual abuse stopped January 1, 2012. The date stood out to E.M. because one of her friends had died the night before in a traffic accident, and See had vaginal intercourse with her to "cheer her up." She testified that was the last time he had sex with her. In 2012, E.M. told her father, B.M., that See had abused her. B.M. informed the police. As part of the police investigation, K.S. and S.S. were interviewed by social workers from the Mayerson Center about whether See had ever sexually abused either of them. Both

K.S. and S.S. denied that they had ever been abused. A grand jury was convened, but declined to indict See or Stites.

{¶8} The defense presented the testimony of several family members and friends, including siblings of the victims. In general, these witnesses testified that they never saw any signs of abuse, the victims never talked about any abuse growing up, and that because the houses the family lived in over the years were small and contained a lot of people, See would not have had the privacy necessary to commit such sexual abuse without others knowing.

{¶9} See's codefendant Stites also testified. Stites testified that See never sexually abused any of the victims. Stites explained why she believed the victims would fabricate the abuse allegations. She testified that after K.S. gave birth in 2015, Stites and See became the primary caretakers of the baby because K.S. was unable to properly care for the baby. After K.S. told them that she and the baby were moving out of the house, Stites told K.S. that she was going to file for custody. Although she never actually followed through, Stites testified that her threat to file for custody is what caused K.S. to falsely claim that See had abused her. Regarding S.S.'s allegations, Stites testified that S.S. never forgave her for breaking up See's marriage to S.S.'s biological mother. Stites also testified about E.M.'s behavioral and psychological problems and how E.M. always rebuffed their attempts to discipline her.

{¶10} For ease of discussion, we first address See's third and fourth assignments of error.

5

***Third Assignment of Error***

**{¶11}** In his third assignment of error, See argues that his convictions were based upon insufficient evidence. The test for determining if the evidence was sufficient to sustain a conviction is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). It is a question of law for the court to determine, the court is not to weigh the evidence. *MacDonald* at ¶ 12.

**{¶12}** See was convicted of 30 offenses over two indictments. The B17 indictment charged See with nine offenses against K.S., including sexual battery, unlawful sexual conduct with a minor, and rape.

**{¶13}** The state alleged two types of sexual battery. Under R.C. 2907.03(A)(1), the state was required to prove that See purposely engaged in sexual conduct with K.S., and knowingly, and by means that would prevent resistance by a person of ordinary resolution, coerced K.S. to submit to such sexual conduct. Under R.C. 2907.03(A)(5), the state was required to prove that See purposely engaged in sexual conduct with K.S., and See was the natural parent, or adoptive parent, or stepparent, or guardian, or custodian, or person in loco parentis of K.S.

**{¶14}** To prove unlawful sexual conduct with a minor, the state was required to prove that See purposely engaged in sexual conduct with K.S., that See knew that K.S. was 13 years of age or older, but less than 16 years of age, or See was reckless in

6

that regard, and at the time of the offense See was ten or more years older than K.S. *See* R.C. 2907.04(A).

**{¶15}** To prove rape, the state was required to prove that See engaged in sexual conduct with K.S., who was under 13 years of age, whether or not See knew her age. *See* R.C. 2907.02(A)(1)(b). Some of the counts for rape allege that K.S. was less than ten years of age for purposes of sentencing. *See* R.C. 2907.02(B).

**{¶16}** See does not dispute his status as either father or stepfather to all of the victims. He also does not dispute the ages of the victims at the time of the offenses. His main argument regarding sufficiency is that there was a lack of specificity in the victims' testimony as to when the offenses occurred and what sexual activity occurred.

**{¶17}** Ordinarily, precise times and dates are not essential elements of offenses. *State v. Rucker* 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, ¶ 42, citing *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). "In a criminal charge the exact date and time are immaterial unless in the nature of the offense exactness of time is essential. It is sufficient to prove the alleged offense at or about the time charged." *Sellards* at 171. "In many cases involving the sexual abuse of children, the victims are simply unable to remember exact dates, especially where the crimes involve a repeated course of conduct over an extended period of time." *Rucker* at ¶ 43.

**{¶18}** After a review of the record, the evidence was clearly sufficient as to counts one through eight. For those counts, K.S. testified to sexual conduct with See during or about the time periods alleged in the indictment.

{¶19} In count nine, the time period alleged in the indictment does not align with the time period testified to by K.S. The indictment alleged that between January 4, 2007, and December 31, 2007, See, without privilege to do so, inserted, however slight, any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening, of K.S., who was less than 13 years of age, whether or not See knew K.S.'s age. *See* R.C. 2907.02(A)(1)(b). K.S. testified that See digitally penetrated her "hundreds of times," but the first time was not until 2010, roughly three years after the time period alleged in count nine.

{¶20} Our standard of review on a sufficiency challenge is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found *all the essential elements of the offense* beyond a reasonable doubt." (Emphasis added.) *MacDonald,* 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, at ¶ 12. As discussed above, precise dates are generally not essential elements of offenses, especially in cases of childhood sexual abuse. *See Rucker,* 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, at ¶ 42.

{¶21} K.S. testified that See digitally penetrated her in 2010, a year in which she would have been between ten and 11 years old. Count nine was the only allegation of rape through digital penetration in B17. Thus, there was no risk that the jury could have found See guilty more than once for the same instance of digital penetration. Therefore, even though K.S.'s testimony placed the digital penetration three years after the time period alleged in the indictment, her testimony nevertheless permitted the jury to find all of the essential elements of R.C.

2907.02(A)(1)(b) proven beyond a reasonable doubt. The evidence is sufficient as to count nine.

{¶22} The counts in B18 related to See's sexual abuse of S.S. and E.M. See does not make any specific arguments regarding the sufficiency of the evidence on the counts in B18. Rather, he generally attacks the credibility of the testimony of S.S. and E.M.

{¶23} The counts in B18 alleged rape, sexual battery, and gross sexual imposition. The rape and sexual-battery counts vary somewhat as to the sexual acts alleged and the time periods the acts were alleged to have occurred, but the essential elements are the same as the rape and sexual-battery counts discussed above. To prove gross sexual imposition, the state had to prove that See purposely caused E.M. and S.S. to have sexual contact, and that at least one of them was less than 13 years of age, whether See knew their ages or not. *See* R.C. 2907.05(A)(4).

{¶24} After a review of the record, the evidence was sufficient as to all counts in B18. The third assignment of error is overruled.

### *Fourth Assignment of Error*

{¶25} In See's fourth assignment of error, he argues that his convictions were against the manifest weight of the evidence.

{¶26} When determining whether a defendant's conviction was against the manifest weight of the evidence, "we review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned.' " *MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, at ¶ 24, quoting *Martin,* 20 Ohio App.3d at 175, 485

N.E.2d 717. Reversal of a conviction and a grant of a new trial should only be done in "exceptional cases in which the evidence weighs heavily against the conviction." *MacDonald* at ¶ 24.

{¶27} The case essentially came down to a credibility determination between the state's witnesses and the defense witnesses. All three victims provided damning testimony detailing years of sexual abuse at the hands of See. Their testimony was also supported by other state witnesses.

{¶28} K.S.'s testimony was supported by multiple witnesses. C.D., K.S.'s boyfriend, testified that K.S. told him in 2015 about her sexual encounters with See. The school resource officer at K.S.'s school testified that in 2015 K.S. disclosed to him that See had been sexually abusing her. K.S.'s school counselor testified that she believed that K.S.'s mental-health issues and behavioral problems at school were consistent with a child suffering sexual abuse, although K.S. never disclosed any sexual abuse to her.

{¶29} E.M. and S.S. corroborated each other's testimony. They told very similar accounts of the incident in summer 2001 in which they performed sexual acts with See in exchange for a lollipop. They also both testified that at first E.M. was apprehensive about performing fellatio on See, and so S.S. went first while E.M. watched.

{¶30} E.M.'s testimony was supported by the testimony of her biological father, B.M. B.M. testified that E.M. would come home from her visits with See and Stites "angry, mad, disruptive," and that in 2012 E.M. told him about See's sexual abuse. C.M. is E.M.'s stepmother. She testified that she wanted E.M.'s visitations with See and Stites to be supervised because "something wasn't right with [E.M.]."

She testified that every time E.M. would come home from visiting See she was depressed, crying, and upset. She testified that E.M. would "play with" her privates a lot when she was five or six years old.

{¶31} S.S.'s testimony was supported by D.S., S.S.'s biological mother. D.S. testified that in summer 2001, after returning from staying with See and Stites, S.S. told her that See had been "touching her and kissing on her." Although S.S. recanted and said that it had all been a dream, D.S. testified that S.S. would ask her not to go to See's every summer afterwards, but D.S. would make her go so that she could spend time with her brother, who lived with See and Stites. Finally, D.S. testified that after the visit in 2005, S.S. was "really anxious," and begged D.S. not to send her to See's house again.

{¶32} See's defense rested on two main strategies. First, the defense attacked the details of the victims' testimony, such as their timelines of the abuse, why they waited years to report the abuse, and why K.S. and S.S. denied that any abuse happened when they were interviewed by the Mayerson Center social workers in 2012. Second, the defense offered the testimony of others who lived with See and Stites at various times and denied ever seeing any indications of abuse.

{¶33} All of the victims were very young when the abuse started, between four and eight years old. K.S., E.M., and S.S. all testified as to why they waited so many years to disclose the abuse, and in the cases of K.S. and S.S., why in 2012 they denied that any abuse had occurred. K.S. testified that See told her that what he was doing was "what all daddies did. He said that all daddies did this to his little girls," and that he was preparing her "to be a woman, how to love a man." S.S. testified that she recanted in 2001 and denied any abuse in 2012 because she did not want to be

11

responsible for putting See in prison, and that despite the abuse, he was her father and she wanted him to be in her life. E.M. testified to similar reasons—she did not know that the sexual activity with See was wrong, and Stites was her mother and E.M. wanted a relationship with her.

{¶34} "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

{¶35} The jury clearly believed the victims' testimony over that of the defense witnesses. Also, that the other siblings and relatives did not see any signs of abuse does not mean that the abuse was not happening. The victims testified that they and their siblings often stayed at other relatives' houses, and that See would abuse them when their siblings were staying with relatives, or at nighttime when others were asleep.

{¶36} Nothing presented by See leads us to believe that this is one of those "exceptional cases in which the evidence weighs heavily against the conviction." *See MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, at ¶ 24. The fourth assignment of error is overruled.

### First Assignment of Error

{¶37} In his first assignment of error, See argues that by admitting evidence of E.M.'s post-rape psychological issues and photographs of the victims, the trial court violated Evid.R. 403(A).

{¶38} Evid.R. 403(A) provides that "although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

12

{¶39} First, we discuss E.M.'s testimony regarding her post-rape psychological issues. E.M. testified that after she was abused by See, and the grand jury declined to indict See in 2012, she "kind of spiraled out of control, started experimenting with drugs and had become extremely promiscuous, and eventually got into some legal trouble."

{¶40} Defense counsel did not object to this testimony. Therefore, See has waived all but plain-error review. *State v. Baker*, 1st Dist. Hamilton Nos. C-080157 and C-080159, 2009-Ohio-4188, ¶ 57. To constitute plain error, an error must be "obvious," and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 177. "Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*

{¶41} See argues that E.M.'s testimony regarding her post-abuse psychological issues was meant to inflame the jury. Although the relevance of E.M.'s psychological issues to See's guilt/innocence is low, the prejudicial impact is also low. In fact, See argued that E.M.'s testimony about her decline in her mental and emotional health and behavioral problems led her to make false allegations against See and Stites. See has failed to demonstrate that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice such that but for the error, the outcome of the trial clearly would have been otherwise.

{¶42} Next, we discuss the trial court's admission, over defense objection, of photographs of the victims as children. Under Evid.R. 403, the admission of photographs is left to the sound discretion of the trial court. *State v. Cephas*, 1st Dist. Hamilton No. C-180105, 2019-Ohio-52, ¶ 27. "The term 'abuse of discretion'

13

connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶43} In a prosecution for rape and gross sexual imposition, the Seventh District held that the trial court did not abuse its discretion in admitting a photograph of the 11-year-old victim. *State v. Davis*, 7th Dist. Mahoning No. 05MA3, 2007-Ohio-1397, ¶ 39. The court reasoned that the photograph was probative because it depicted what the victim looked like at the time of the offenses, and that there was "nothing prejudicial in allowing the jury to see just what a ten or eleven year old girl looked like." *Id.*; *see State v. Carey*, 5th Dist. Licking No. 2008-CA-20, 2009-Ohio-103, ¶ 100 (citing *Davis* and holding that where the state had to prove the age of the victims, photographs depicting the victims at the time of the offenses were probative and not unduly prejudicial).

{¶44} The prosecution conceded that the ages of See's victims were not in dispute, but explained that since the victims were now testifying as adults, admission of the photographs was necessary to show the jury the "gravity of the case and the true situation that this child was in, they need to see her when she was the victim." One of the defense themes was that the victims' testimony was not credible because they kept silent or denied the abuse for years. The photographs demonstrated one of the reasons the victims kept the abuse secret for so long—because they were so young when it occurred.

{¶45} See has failed to show that the trial court's admission of the photographs was arbitrary, unreasonable, or unconscionable. The first assignment of error is overruled.

## Second Assignment of Error

{¶46} In his second assignment of error, See argues that the trial court abused its discretion when it admitted two hearsay statements.

{¶47} First, B.M. testified about statements made to him by E.M. when she disclosed See's abuse to him. B.M. testified that he and E.M. had gotten into a fight about her room being messy. They went for a ride in the car to talk and calm down. B.M. testified that E.M. was "really shaky, nervous, looked really scared. She was really just upset. * * * really shaky, clammy, angry. She was just a bundle of nerves." When the prosecution asked B.M. what E.M. said, defense counsel objected. The court permitted B.M. to testify to what E.M. said on the basis that E.M.'s statements were an excited utterance. B.M. testified that E.M. told him that See had molested her and had had sex with her.

{¶48} Evid.R. 802 prohibits the admission of hearsay. Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶49} Evid.R. 803(2) provides an exception to the prohibition against hearsay for an excited utterance, which is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶50} Hearsay statements may be admissible as an excited utterance when:

1) there is an event startling enough to cause "nervous excitement" in the declarant, 2) the statement, though not strictly contemporaneous, was made before the declarant had time for the nervous excitement to

subside, 3) the statement related to the startling event, and 4) the declarant personally observed the startling event.

*State v. Smith*, 1st Dist. Hamilton No. C-180499, 2019-Ohio-3257, ¶ 17.

**{¶51}** Excited utterances are deemed reliable because they are made before the declarant has an opportunity to reflect, thus reducing the chance to fabricate or distort the truth. *Id.* at ¶ 18. "Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense." *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993). Although the passage of time between the startling event and the statement is relevant, it is not dispositive. *Id.*

**{¶52}** Rather, the key determination is whether the statement was the result of reflective thought. *State v. Harris*, 163 Ohio App.3d 286, 2005-Ohio-4696, 837 N.E.2d 830, ¶ 7 (1st Dist.). "When statements come with the opportunity for reflective thought, they cannot squeeze through the excited utterance exception." *Smith*, 1st Dist. Hamilton No. C-180499, 2019-Ohio-3257, at ¶ 18, quoting *Harris* at ¶ 7. In *Smith,* this court held that the declarant's statement was not an excited utterance where she hesitated to initially tell police officers what happened—the statement "lacked the spontaneous quality necessary for an excited utterance." *Smith* at ¶ 19.

**{¶53}** It is unclear from the testimony how soon after the last incident of sexual abuse E.M.'s statement to B.M. was made. Regardless, there was a fight between the two and then a car drive to calm down. There was an opportunity for

reflective thought, and the statement lacked spontaneity. Thus, E.M.'s statement to B.M. did not carry the level of trustworthiness necessary to serve the purposes of the exited-utterance exception.

{¶54} The trial court acknowledged a "temporal aspect" to the excited-utterance exception, but based his ruling on E.M.'s emotional and physical state at the time she made the statement—that she was "shaky, nervous, scared, upset." Merely being upset at the time the statement was made does not meet the standard for admissibility as an excited utterance. *Taylor*, 66 Ohio St.3d at 303, 612 N.E.2d 316. The trial court's ruling was an abuse of discretion.

{¶55} See also argues that a statement made by D.S., S.S.'s biological mother, was inadmissible hearsay. D.S. testified that S.S. disclosed to her that See "was touching her and kissing on her, and she didn't want to go back." Defense counsel objected to the testimony as hearsay. The prosecution argued that D.S.'s testimony was not hearsay because the prosecutor did not ask D.S. to repeat the actual statement, but rather asked D.S. about the nature of S.S.'s disclosure. The trial court admitted the statement on that basis.

{¶56} D.S. may not have put quotation marks around her testimony, but her testimony went directly to the substance of S.S.'s statement. Therefore, this statement was hearsay and should not have been admitted.

{¶57} Regardless, any error as a result of the admission of the hearsay statements by B.M. and D.S. was harmless. E.M. and S.S. were subject to cross-examination about the statements, and the hearsay testimony was cumulative because E.M. testified to making the statements to B.M., and S.S. testified to making the statements to D.S. *See Cornell v. Hatfield*, 12th Dist. Fayette No. CA2017-03-

006, 2018-Ohio-549, ¶ 18 ("any error in the admission of hearsay is generally harmless when the declarant is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature"); *In re Z.,* 1st Dist. Hamilton No. C-190026, 2019-Ohio-1617, ¶ 15 (when inadmissible hearsay is cumulative, its admission is typically harmless).

{¶58} Also, as discussed above, the victims' testimony was corroborated by more than just the hearsay testimony. The trial court abused its discretion in admitting the hearsay testimonies of B.M. and D.S., but the error was harmless. The second assignment of error is overruled.

### *Fifth Assignment of Error*

{¶59} In his fifth assignment of error, See argues that he was denied the effective assistance of counsel because his counsel failed to hire an independent expert to testify to the lack of reliability in cases of "late disclosed sexual abuse."

{¶60} "To establish an ineffective-assistance-of-counsel claim, a defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense, thereby depriving him of a fair trial." *State v. Jones*, 1st Dist. Hamilton No. C-180091, 2019-Ohio-4862, ¶ 80, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶61} Regarding the second prong, prejudice requires there to be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones* at ¶ 81, quoting *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). "A defendant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other." *Jones* at ¶ 81, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

{¶62} In *Jones,* the defendant argued that he was denied the effective assistance of counsel where defense counsel failed to call two witnesses to testify regarding alleged promises made by police to a witness. *Jones* at ¶ 82. However, there was no evidence in the record as to how either of the witnesses would have testified, and so this court held that the defendant had failed to prove the prejudice prong of the *Strickland* test. *Id.*

{¶63} Similarly, in the present case, there is no evidence in the record as to how an expert witness would have testified regarding "late disclosed sexual abuse." See argues that an expert witness on childhood sexual abuse *could* have rebutted the state's witnesses, or *could* have testified that allegations of childhood sexual abuse disclosed later in the victim's life are unreliable. However, we simply do not know how an expert witness would have testified, and we cannot base our ruling on See's speculation. Thus, without any evidence of prejudice, we cannot find that See was denied the effective assistance of counsel. His fifth assignment of error is overruled.

### Sixth Assignment of Error

{¶64} In his sixth assignment of error, See argues that the individual group of sentences for each victim were grossly disproportionate to his respective offenses and violate the Eighth Amendment to the United States Constitution by subjecting him to cruel and unusual punishment.

{¶65} The Ohio Supreme Court addressed the cruel-and-unusual punishment provision of the Eighth Amendment in *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073. The court held:

The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.

\* \* \*

Cases in which cruel and unusual punishments have been found are limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person, and \* \* \* the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.

(Citations omitted.) *Id.* at ¶ 13-14, quoting *State v. Weitbrecht*, 86 Ohio St.3d 368, 371-373, 715 N.E.2d 167 (1999); *see State v. Williams*, 2017-Ohio-8898, 101 N.E.3d 547, ¶ 30 (1st Dist.).

{¶66} However, when reviewing a claim of cruel and unusual punishment, *Hairston* requires that a court review the proportionality of the individual sentences rather than the cumulative impact of consecutive sentences. *Hairston* held, "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Hairston* at syllabus. The *Hairston* court rejected the defendant's Eighth Amendment claim despite the fact that he received the maximum sentence on each individual count and the trial court ran the sentences consecutively for an aggregate sentence of 134 years. *Id.* at ¶ 9. The court held "[b]ecause the individual sentences imposed by the court are within the range of penalties authorized by the legislature, they are not grossly disproportionate or shocking to a

reasonable person or the community's sense of justice and do not constitute cruel and unusual punishment." *Id.* at ¶ 23.

{¶67} See's aggregate sentence was four consecutive life sentences, to be served consecutively to 221 years. See does not challenge any of his individual sentences. Rather, See argues that "the individual *group* of sentences for each girl imposed by the trial court are grossly disproportionate to the offense." (Emphasis added.) See seems to argue that the trial court should not have made the individual sentences for each victim consecutive because they were part of the same act or transaction. For example, See argues that "[w]hile the counts on B1706834 each deal with different time periods, the sexual contact with [K.S.] was a series of acts bound together at the same location, the See residence." With regard to the three life sentences imposed for E.M., See argues, "These offense were against one person, and all – as was the case with [K.S.], . . . a series of continuous acts bound towards a single objective."

{¶68} See points us to R.C. 2929.14(D)(1)(b) for the proposition that the court may not impose more than one prison term on an offender for felonies that were committed as part of the same "act or transaction." Previous versions of R.C. 2929.14(D)(1)(b), including versions in effect during the years of abuse, provided that "[e]xcept as provided in division (D)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (D)(1)(a) of this section for felonies committed as part of the same act or transaction."

{¶69} But the offenses of which See was convicted were not all part of one act or transaction. He abused three different victims on multiple occasions over a period of 15 years. Each count alleged an act of abuse separate and distinct from the other

counts. His offenses were not part of a continuing course of conduct that would require concurrent sentences under the law.

**{¶70}** See further argues that ordering that his mandatory life sentences be served consecutively amounts to cruel and unusual punishment. See received three consecutive life sentences for raping E.M. and a fourth life sentence for raping S.S. The court made the necessary consecutive sentencing findings, both during the sentencing hearing and in the sentencing entry. Nevertheless, See argues that he "can only live one life and can only serve one life." This court rejected that argument in *State v. Williams*, 2017-Ohio-8898, 101 N.E.3d 547, ¶ 31 (1st Dist.), and we again reject it here. The Supreme Court of Ohio has pronounced that "Eighth Amendment proportionality review does not apply to consecutive sentences." *Id.* at ¶ 31, citing *Hairston,* 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, at ¶ 20. We are bound by the dictates of Ohio Supreme Court precedent. See's aggregate sentence does not constitute cruel and unusual punishment.

**{¶71}** See's sixth assignment of error is overruled.

### Conclusion

**{¶72}** For the foregoing reasons, See's assignments of error are overruled and the judgments of the trial court are affirmed.

Judgments affirmed.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.