[Cite as *Cincinnati v. PE Alms Hill Realty, L.L.C.*, 2023-Ohio-2784.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| CITY OF CINCINNATI, et al., | : | APPEAL NO. C-220503 |
| Plaintiffs, | | TRIAL NOS. A-1500883 |
| | : | A-1602970 |
| and | | A-1602971 |
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF COMM 2014-UBS3 MORTGAGE TRUST COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, acting by and through its Special Servicer, LNR Partners, LLC, | : | *O P I N I O N.* |
| and | : | |
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF COMM 2014-LC17 MORTGAGE TRUST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATE, acting by and through its Special Servicer, LNR Partners, LLC, | : | |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| PE ALMS HILL REALTY LLC, et al., | : | |
| Defendants, | : | |
| and | : | |
| CHAIM PURETZ, | : | |
| Defendant Appellant. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: August 11, 2023

*Porter, Wright, Morris & Arthur, LLP, Terry W. Posey, Jr., Tami Hart Kirby, Emma W. Walton*, and *Susan K. Cliffel*, for Plaintiffs-Appellees,

*Wong Fleming P.C., Daniel C. Fleming, Hennis Rothstein and Ellis LLP*, and *Steven M. Rothstein*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant Chaim Puretz guaranteed loans for several corporate entities that owned and managed residential rental properties. When those properties were declared public nuisances, Puretz was ultimately held individually liable for recourse on the loans. This was because, in executing the loan guarantees, Puretz agreed to "springing recourse liability" if the building ownership companies defended themselves in any legal action against the banks, and the companies had done so in a number of ways over time. On appeal, Puretz seeks to undo the individual liability he agreed to on the basis of what he argues were two procedural missteps by the court below.

{¶2} Puretz raises two assignments of error. First, he argues that the trial court erred in awarding summary judgment to plaintiffs-appellees U.S. Bank National Association, as Trustee for the Benefit of the Holders of Comm 2014-UBS3 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("U.S. Bank") and Wilmington Trust, National Association, as Trustee for the Benefit of the Holders of Comm 2014-LC17 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("Wilmington Trust") on their complaints for breach of guaranty obligations. Second, he contends that the trial court violated his due process rights in the way that it executed summary judgment. The trial court initially awarded summary judgment to U.S. Bank and Wilmington Trust as to liability only and scheduled a trial as to damages. But when an evidentiary issue arose that postponed the trial, the trial court reconsidered its earlier decision and issued a new ruling that awarded the banks summary judgment as to both liability and damages. Puretz claims his surprise about this outcome

3

amounts to a constitutional violation. Finding both of these arguments to be without merit, we affirm the trial court's judgment.

### *Factual and Procedural Background*

{¶3} The procedural history of this case is lengthy and complicated. We summarize it as succinctly as possible.

### *1. The Guaranties are Executed*

{¶4} In April of 2014, a $14,310,000 loan was issued to PE Alms Hill Realty LLC, PE Reids Valley View Realty LLC, PE Shelton Gardens Realty LLC, and PE Lima Club West Realty LLC (collectively the "Alms Borrowers"). Except for PE Lima Club West Realty LLC, which was located in Allen County, Ohio, each of these borrowing entities was a limited liability company that owned apartment projects in Hamilton County, Ohio. U.S. Bank is the current holder of a promissory note, mortgage, and loan agreement that were executed at the time that the loan was issued. The mortgage secured the Alms Borrowers' obligations and encumbered the various apartment projects.

{¶5} In September of 2014, a $5,300,000 loan was issued to PE Entowne Manor Realty LLC, PE Burton Realty LLC, PE Founders Home Realty LLC, and PE Georgia Morris Realty LLC (collectively "Entowne Borrowers"). Each of the Entowne Borrowers were limited liability companies owning apartment projects in Hamilton County. Wilmington Trust is the current holder of the promissory note, mortgage, and loan agreement for these loans. The mortgage encumbered the apartment projects owned by the Entowne Borrowers.

**{¶6}** Puretz, who was the owner of either direct or indirect interests in each of the borrowing entities, executed a guaranty of recourse obligations for each loan. Each guaranty stated that the lender "is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees the payment and performance to Lender of the Guaranteed Obligations (as herein defined)."

**{¶7}** The guaranties set forth Puretz's obligations as guarantor, providing in Section 1.1(a) that:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**{¶8}** The term "Guaranteed Obligations" was defined as "(i) Borrower's Recourse Liabilities, (ii) from and after the date that any Springing Recourse Event Occurs, payment and performance of all of the Obligations, and (iii) the obligation, on a primary basis, to comply with, or to cause compliance with, the requirements of Section 4.34 of the Loan Agreement."

**{¶9}** Both the referenced "Borrowers' Recourse Liabilities" and "Springing Recourse Event" were set forth in Section 10.1 of the parties' loan agreements. This section first provided that the lenders shall not bring an action seeking a monetary judgment against the borrowers, but that they "may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to

5

enable Lender to enforce and realize upon its interest under the Note * * *." Section 10.1 of the loan agreement added that this provision shall not:

> constitute a waiver of the right of Lender to enforce the liability and obligation of Borrowers, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrowers for any or all of the following being referred to herein as "Borrowers' Recourse Liabilities"):
>
> (i) fraud, willful misconduct, misrepresentation or failure to disclose a material fact by or on behalf of any Borrower, Guarantor, any Affiliate of any Borrower or Guarantor, or any of their respective agents or representatives in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act (RICO);
>
> *   *   *
>
> (iii) wrongful removal or destruction of any portion of any Property or damage to any Property caused by willful misconduct or gross negligence;
>
> (iv) any physical waste of any of the Properties;
>
> *   *   *
>
> (vii) failure to pay charges for labor or materials or other charges that can create Liens on any portion of any Property;
>
> *   *   *

6

(ix) the failure to pay Taxes or transfer taxes;

* * *

(xiii) any cost or expense incurred by Lender in connection with the enforcement of its rights and remedies hereunder or any other Loan Document;

**{¶10}** Section 10.1 of the loan agreements also set forth multiple springing recourse events, each of which would trigger Puretz's obligations under the guaranties, including, as relevant to this appeal:

if Guarantor (or any Person comprising Guarantor), any Borrower or any Affiliate of any Borrower, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Mortgages or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan.

### *2. The Nuisance Action*

**{¶11}** In February 2015, in the case numbered A-1500883, the city of Cincinnati filed a public nuisance complaint alleging that various apartment projects in the Cincinnati area, including those owned by the Alms Borrowers and the Entowne Borrowers, were a menace to public health, welfare, or safety; were structurally unsafe; and had been the subject of numerous health, fire, and building code violations. The complaint sought injunctive and declaratory relief, as well as the appointment of a

7

receiver. Both U.S. Bank and Wilmington Trust were named as defendants due to the mortgage interests they held in the named apartment projects.

{¶12} U.S. Bank and Wilmington Trust filed a joint motion for the appointment of a receiver. Each also filed a third-party complaint for foreclosure, asserting that the Alms and Entowne Borrowers had breached the note and loan agreement described above and seeking to foreclose on the mortgages. In response, the Alms and Entowne Borrowers opposed the motion for the appointment of a receiver and filed answers asserting various affirmative defenses.

{¶13} In January 2016, the trial court found both that the properties constituted a public nuisance and that the owners had failed to abate the nuisance and, in February 2016, granted the motion to appoint a receiver. The receivership order encompassed all the Alms and Entowne Borrowers, with the exception of PE Lima Club West Realty LLC. That borrower was made subject to the receivership order in April 2016.

{¶14} Both U.S. Bank and Wilmington Trust filed motions for summary judgment on their complaints for foreclosure against the Alms and Entowne Borrowers. While those motions were pending, the trial court granted the receiver's motion to sell the receivership properties. On April 2, 2019, the receiver filed notice that all receivership properties were sold.

{¶15} On March 2, 2020, the trial court granted summary judgment to U.S. Bank and Wilmington Trust on their foreclosure complaints. With respect to the award of summary judgment to Wilmington Trust, the trial court found that the Entowne Borrowers failed to pay the accelerated balance of the note after declaration of default and that the Entowne Borrowers had committed additional acts of default

by failing to notify Wilmington Trust both of a management change and the city's nuisance lawsuit. The trial court made the same findings of default with respect to the Alms Borrowers when granting summary judgment to U.S. Bank, additionally finding default based on the recording of a mechanic's lien against one of the properties.

### 3. Complaints for Breach of Guaranties

{¶16} The actions taken by the Alms and Entowne Borrowers in the nuisance and foreclosure actions led to U.S. Bank and Wilmington Trust seeking to enforce the guaranties executed by Puretz.

{¶17} In May of 2016, in the case numbered A-1602970, U.S. Bank filed a complaint for breach of guaranty against Puretz. Wilmington Trust likewise filed a complaint for breach of guaranty against Puretz in the case numbered A-1602971. Upon the motion of U.S. Bank and Wilmington Trust, these two cases were consolidated with the nuisance action in the case numbered A-1500883.

{¶18} The complaints each asserted two counts for breach of guaranty, one based on a springing recourse event and the second based on the borrowers' waste of the property and failure to pay taxes. As to the first count, the complaint alleged that the actions taken by the Alms and Entowne Borrowers in the public nuisance action, including their opposition to the appointment of a receiver and their answers to the complaints for foreclosure, were defenses to an enforcement action or to the assertion of a right by the lenders that constituted a springing recourse event rendering the loans fully recourse. According to the assertions in the complaint, once the loan became fully recourse, Puretz became unconditionally liable for the entire unpaid balance of the loan pursuant to the terms of the guaranty. The balance due on each loan, including interest, fees, and costs, was set forth in the complaints. As to the second

9

count for breach of guaranty, the complaints asserted that Puretz was liable on the guaranties because the borrowing entities had failed to pay real estate taxes and had physical waste of the properties, resulting in them being declared public nuisances.

{¶19}  In December 2019, U.S. Bank and Wilmington Trust moved for partial summary judgment on count one of their respective complaints against Puretz individually.  Accompanying each motion for summary judgment was an affidavit from Leah Solomon, an Asset Manager with LNR Partners, LLC ("LNR"), the Special Servicer of the notes held by U.S. Bank and Wilmington Trust.[1]

{¶20}  On September 15, 2020, the trial court issued an entry granting the partial motions for summary judgment.  The court first referenced its previous determination that the Alms and Entowne Borrowers had breached their contract with the lenders and that the lenders had been granted summary judgment on those claims. It then held that Puretz had entered into binding contracts with U.S. Bank and Wilmington Trust and that those entities were damaged by Puretz's breach.  The trial court rejected Puretz's arguments that the guaranties were unconscionable and that various provisions of the guaranties were in conflict.

{¶21}  After granting summary judgment on the issue of liability, the trial court scheduled a hearing on damages before a magistrate.  The damages hearing was stopped in progress when the magistrate ordered briefing on the admissibility of exhibits prepared by Solomon, who was scheduled to be a witness for U.S. Bank and Wilmington Trust.  Puretz contended that these exhibits contained inadmissible hearsay, while the lenders argued that the documents were admissible under Evid.R. 803(6) as adoptive business records.  The magistrate ultimately concluded that the

---

[1] These affidavits are discussed in detail later in this opinion.

exhibits qualified as adoptive business records pursuant to Evid.R. 803(6), and Puretz filed objections to this decision.

**{¶22}** While Puretz's objections were pending, the trial court sua sponte granted summary judgment on all claims to U.S. Bank and Wilmington Trust. In so doing, the court determined that no genuine issues of material fact existed regarding damages. With respect to U.S. Bank, the trial court's entry awarded damages as follows:

In the principal sum of $13,204,587.45, plus accrued and unpaid interest in the amount of $2,851,146.06, plus late charges in the amount of $43,028.64, plus inspection fees incurred by Plaintiff and not reimbursed by the Borrowers in the amount of $495.00, plus interest on the unpaid principal balance of the Note commencing November 1, 2019 at the default rate of $3,825.66 per day, plus attorneys' fees and costs expended; plus the Prepayment Fee (as defined in the Loan Agreement) in the amount of $2,057,443.33, plus the Liquidated Damages Amount (as defined in the Loan Agreement) in the amount of $153,340.93, plus administrative and processing fees in the amount of $3,375.00.

**{¶23}** As for Wilmington Trust, it was awarded damages:

In the principal sum of $5,094,717.69, plus accrued and unpaid interest in the amount of $2,034,182.23, plus taxes, title and other fees (other than attorneys' fees) paid, advanced or otherwise incurred by Plaintiff and not reimbursed by the Borrowers in the amount of $649,686.34, plus late charges in the amount of $2,364.84, plus the Prepayment Fee

11

and the Liquidated Damages Amount aggregating $720,236.80, plus administrative, processing and special servicing fees in the aggregate amount of $50,868.91, plus interest on the unpaid principal balance of the Note commencing November 1, 2019 at the default rate of $1,429.35 per day, plus attorneys' fees and costs expended.

{¶24} Puretz now appeals from the trial court's entry granting summary judgment to U.S. Bank and Wilmington Trust on their claims for breach of guaranty.

### *Summary Judgment on Breach of Guaranty*

{¶25} In his first assignment of error, Puretz argues that the trial court's grant of summary judgment was in error because U.S. Bank and Wilmington Trust failed to establish by competent credible evidence both a default by Puretz and damages and because genuine issues of material fact remain as to both liability and damages.

{¶26} We review a trial court's grant of summary judgment de novo. *Collett v. Sharkey*, 1st Dist. Hamilton No. C-200446, 2021-Ohio-2823, ¶ 8. "Summary judgment is appropriately granted when there exists no genuine issue of material fact, the party moving for summary judgment is entitled to judgment as a matter of law, and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion that is adverse to that party." *Id.*, citing *State ex rel. Howard v. Ferreri*, 70 Ohio St.3d 587, 589, 639 N.E.2d 1189 (1994).

{¶27} Section 6.3 of the guaranties provides that the guaranties and related loan documents are to be governed by New York law. Under our conflict-of-laws principles, we apply New York substantive law per the terms of the parties' contract, but Ohio procedural law, as Ohio is the relevant forum state. *See Nationwide Mut. Fire Ins. Co. v. Rose*, 9th Dist. Lorain No. 05CA008814, 2007-Ohio-1216, ¶ 7.

{¶28} To establish a claim for breach of contract under New York Law, a plaintiff must show the existence of a contract, the plaintiff's performance, the defendant's breach of contractual obligations, and resulting damages. *34-06-73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 178 N.Y.S.3d 1 (2022).

{¶29} Puretz does not dispute the existence of the two guaranties that he executed with U.S. Bank and Wilmington Trust or the lenders' performance under those guaranties. While his arguments on appeal are somewhat disjointed, he seems to focus his challenges on the admissibility of the evidence supporting the lenders' motions for summary judgment and whether the guaranties were either unconscionable or ambiguous.

### 1. Evid.R. 803(6)

{¶30} We deal with Puretz's evidentiary argument first. He contends that the evidence relied upon by the lenders to prove his default—Solomon's affidavits—lacked personal knowledge and referred to exhibits that were inadmissible under Evid.R. 803(6).

{¶31} To properly consider this argument, we review in detail the information in Solomon's affidavits. Included in the affidavits were the following statements, relevant portions of which we emphasize below:

> I am over the age of 18, I am duly authorized to make this Affidavit, and **I make this Affidavit of my own personal knowledge.** I am an Asset Manager of LNR Partners, LLC ("LNR"), which is a Special Servicer of securitized commercial real estate loans as described more fully below. I have been employed with LNR as an Asset Manager since

13

May 3, 2004. I have handled hundreds of securitized commercial loans during my tenure with LNR.

\* \* \*

In the regular performance of my job functions as an Asset Manager, I am responsible for the handling/administration of securitized commercial real estate loans. When certain specified events occur with respect to one of these securitized commercial real estate loans, such as a default by the borrower under the loan documents, servicing of the loan is transferred from the Master Servicer to the Special Servicer. When servicing of one of these loans is transferred to a Special Servicer such as LNR, the loan is assigned to an Asset Manager such as me. **At that time we familiarize ourselves with the loan documents and records in connection with the loan**, and become the person responsible for the day-to-day handling/administration of the loan, including but not limited to communicating with the borrower and making decisions on behalf of the lender.

LNR is the Special Servicer of the securitized commercial real estate loan (the "Loan") evidenced by the Note (as "Note" is defined below) held by Plaintiff Wilmington Trust \* \* \*.[2]

The Loan was transferred to LNR for special servicing on or about October 20, 2015 \* \* \*. Upon that transfer to LNR, I was assigned as the Asset Manager with primary responsibility for the servicing of the Loan on behalf of Plaintiff.

---

[2] This opinion quotes from the affidavit Solomon submitted on behalf of Wilmington Trust. The affidavit submitted on behalf of U.S. Bank contains similar language.

Consistent with the regular performance of my functions as an asset manager, **I familiarized myself with the Loan after it was transferred to LNR for special servicing.** That process included, among other things, reviewing (a) the loan documents associated with the loan, (b) the Third Amended Complaint the City of Cincinnati filed in this case against three of the Borrowers * * *, (c) LNR's records in connection with the Loan, and (d) records relating to the Loan that the Master Servicer provided to LNR as part of the ordinary course of business operations between and among LNR and the Master Servicer. Since the Loan was transferred to LNR for special servicing in October of 2015, I have been the person with primary responsibility for handling the Loan on behalf of Plaintiff and LNR. Accordingly, I am familiar with the business records that LNR maintains for purposes of servicing this Loan. Based on my knowledge of LNR's business practices, the information and data entries in LNR's records (which include data compilations, electronic image documents and others) are records that were made at the time of the events and conditions they describe, by persons at LNR who have first-hand knowledge of those events and conditions or from information provided by persons at LNR with such first-hand knowledge. **These records are maintained in the ordinary course of LNR's business.** * * * **All of the exhibits identified herein and attached to this Affidavit are maintained in the ordinary course of LNR's business. I have**

15

**personally reviewed and am familiar with all of the exhibits
identified herein and attached to this Affidavit.**

{¶32} Soloman's affidavits further detailed the parties to the respective loans and the actions that constituted the borrowers' defaults under the loans, including the borrowers' failure to inform the lenders of the nuisance action filed by the city of Cincinnati. The affidavits explained that the borrowers' defaults on the loan agreements resulted in the lenders' acceleration of the maturity of the notes, which the borrowers' failed to make payment on in full. A copy of the letter notifying borrowers of the acceleration was referenced in and attached to Solomon's affidavits.

{¶33} Solomon explained the public nuisance lawsuit in her affidavits and stated that, after certain properties were found to be a public nuisance, they were sold by a receiver, and the proceeds of the sales were applied to the unpaid balance of the loans. The affidavits further discussed Solomon's role in tracking payments under the loans, stating that:

> I routinely review information and records relating to both amounts
> paid and amounts owed under the loans for which I am asset manager,
> including the Loan. Although the Master Servicer is responsible for
> receiving and tracking payments due on the Loan, I or other LNR
> employees whom I supervise, direct the Master Servicer regarding the
> application of such funds, and have done so with respect to the Loan.

The affidavits also referenced and attached the following documents: the transaction history of the loans, the payoff statements reflecting the borrowers' indebtedness, and LNR's records supporting the calculations in the payoff statements. When referencing the transaction history, Solomon stated that it was "generated for this Loan at my

discretion. I have relied upon the accuracy of the Transaction History in the making of this affidavit." As for the referenced payoff statements, Solomon stated that they were "made at or near the time [they were] dated, [are] based on information obtained from the Transaction History and the Statement Backup, and [were] transmitted by a person with first-hand knowledge of the information contained therein." She additionally stated that these documents were "used and kept in the course of LNR's regularly-conducted business activity" and that it "is the regular practice of LNR to maintain and keep such records."

**{¶34}** Solomon additionally identified the software used to track the loan payments and described the procedure used to apply a payment and create a record. She then detailed the amounts due and owing under the respective loans.

**{¶35}** Puretz argues that Soloman's affidavits were inadmissible under Evid.R. 803(6).

**{¶36}** First, Puretz appears to suggest that Soloman lacks sufficient personal knowledge to be reliable, but we reject that argument. Each affidavit clearly set forth Solomon's responsibilities as an asset manager with LNR and her familiarity with not only the loan documents and related records received from the Master Servicer, but with the public nuisance litigation as well. Soloman also states multiple times that she has personal knowledge of the information she relays. The affidavits therefore sufficiently detail Solomon's history with managing the loan balances in this case to convince us that her statements were made with sufficient personal knowledge.

**{¶37}** We next turn to Puretz's argument that the affidavits rely on documents inadmissible under Evid.R. 803(6). Evid.R. 803(6) provides that the following is not excluded by the hearsay rule even though the declarant is available as a witness:

17

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

**{¶38}** If hearsay is to be admitted under the business-record exception set forth in Evid.R. 803(6), the record must meet the following qualifications: "(1) it must have been kept in the regular course of business; (2) it must stem from a source who had personal knowledge of the acts, events, or conditions; (3) it must have been recorded at or near the time of the transaction; and (4) a foundation must be established by the testimony of either the custodian of the record or some other qualified person." *In re Z.,* 1st Dist. Hamilton No. C-190026, 2019-Ohio-1617, ¶ 12.

**{¶39}** A document may be admitted as a business record even when the entity admitting the document is not its maker "provided that the other requirements of Evid.R. 803(6) are met, and the circumstances indicate that the records are trustworthy." *Great Seneca Fin. v. Felty*, 170 Ohio App.3d 737, 2006-Ohio-6618, 869 N.E.2d 30, ¶ 14 (1st Dist.). The "[t]rustworthiness of a record is suggested by the profferer's incorporation into its own records and reliance on it." *HSBC Bank USA, N.A. v. Gill*, 2019-Ohio-2814, 139 N.E.3d 1277, ¶ 9 (1st Dist.), quoting *U.S. Bank, N.A.*

*v. Christmas*, 2d Dist. Montgomery No. 26695, 2016-Ohio-236, ¶ 18, *vacated on other grounds*, 146 Ohio St. 3d 1468, 2016-Ohio-5108, 54 N.E.3d 1267.

**{¶40}** As explained in the affidavits, the attached records were kept in the regular course of LNR's business and, upon the transfer of a loan from a Master Servicer, were incorporated into LNR's own records. The documents were made at the time of the events or conditions described therein by a person with first-hand knowledge or from information provided by persons at LNR with such first-hand knowledge, and Solomon's affidavits set forth a sufficient foundation for the admission of these records. Further, nothing in the record suggests that these documents are not trustworthy. To the contrary, LNR's use of the documents in its regularly-conducted business activity—managing and administering the loans—provides support for the trustworthiness of the documents. *See id.* at ¶ 9.

**{¶41}** Puretz additionally contends that the documents were inadmissible because they were prepared solely in anticipation of litigation and not for a legitimate business purpose. This contention is not borne out in the record. Rather, Solomon's affidavits established that the documents were used in LNR's regular processing and management of the loans. We therefore hold that Soloman's affidavits were admissible under Evid.R. 803(6), and the trial court did not err in considering them at the summary judgment stage.

### 2. *Additional Evidentiary Challenges*

**{¶42}** While his arguments to us were less than precise, Puretz raised a number of additional evidentiary challenges related to the summary judgment stage, none of which are persuasive.

{¶43} For example, in his reply brief, Puretz advanced the argument that the reliance on the adoptive business records in this situation violates his constitutional right to confrontation under the Sixth Amendment. First, pursuant to Loc.App.R. 16.1(C), a reply brief shall be confined to a rebuttal of the appellee's brief, rather than serve as a vehicle to raise new arguments. Second, even if this court were to consider the argument, we would find it to border on frivolous, as the Confrontation Clause is not plainly applicable to civil cases. *See* U.S. Const. amend. VI ("*In all criminal prosecutions*, the accused shall enjoy the right * * * to be confronted by the witnesses against him.") (Emphasis added.); *Masterson v. Brody*, 8th Dist. Cuyahoga No. 111043, 2022-Ohio-3429, ¶ 64 ("The Confrontation Clause of the Sixth Amendment, however, is not applicable to civil cases.").

{¶44} Puretz also argues that U.S. Bank and Wilmington Trust relied on affidavits from Juan Perez that also contained inadmissible hearsay. This argument is simply incorrect and misstates the record. The lenders relied on the affidavits from Perez in support of their motions for summary judgment in the foreclosure actions against the Alms and Entowne Borrowers, not in support of the motion for summary judgment against Puretz.

{¶45} We accordingly find no error in the trial court's consideration of the evidence submitted by U.S. Bank and Wilmington Trust when considering the motions for summary judgment.

### 3.  *Unconscionability and Ambiguity*

{¶46} Puretz next argues that summary judgment was inappropriate because genuine issues of material fact exist as to whether both the language of the guaranties and the circumstances surrounding the execution of the guaranties rendered them

unconscionable and because certain provisions of the guaranties are ambiguous and conflict with provisions in the related loan documents.

### A. Unconscionability

{¶47} We first consider Puretz's unconscionability argument. The unconscionability of a contract is an affirmative defense. *Frenchtown Square Partnership v. Nick Ents. Inc.*, 11th Dist. Trumbull No. 2020-T-0038, 2021-Ohio-663, ¶ 10, quoting *Defoe v. Schoen Builders*, LLC, 6th Dist. Wood No. WD-18-031, 2019-Ohio-2255, ¶ 40. U.S. Bank and Wilmington Trust argue that Puretz has waived this defense by failing to assert it in his answer. In considering this procedural argument, we apply Ohio law. *See Nationwide Mut. Fire Ins. Co.*, 9th Dist. Lorain No. 05CA008814, 2007-Ohio-1216, ¶ 7.

{¶48} Under Ohio law, other than the defenses set forth in Civ.R. 12(B), which do not include the defense of unconscionability, an affirmative defense is waived if not asserted in an answer. *Id.*; *Brown v. Village of Lincoln Heights*, 195 Ohio App.3d 149, 2011-Ohio-3551, 958 N.E.2d 1280, ¶ 10 (1st Dist.).

{¶49} Puretz did not assert the defense of unconscionability in his answer to U.S. Bank and Wilmington Trust's complaints. Having failed to do so, he has waived that defense, and we therefore do not consider his argument on appeal.

### B. Ambiguity

{¶50} Puretz next argues that genuine issues of material fact exist as to whether the guaranties were ambiguous. He contends that the clauses in the guaranties rendering his obligations fully recourse upon the occurrence of a springing recourse event, specifically the assertion by either himself or a borrower of a defense

against a lender, conflict with a section in the loan documents authorizing him to assert a compulsory counterclaim.

**{¶51}** We need not reach the merits of this argument because Puretz, in the execution of the guaranties, contractually waived his right to challenge the guaranties on this ground. As noted by U.S. Bank and Wilmington Trust, the following sections of the guaranties prohibit Puretz from raising this challenge:

> Section 1.3   Guaranteed Obligations Not Reduced by Offset.   The
> Guaranteed Obligations and the liabilities and obligations of Guarantor
> to Lender hereunder shall not be reduced, discharged or released
> because or by reason of any existing or future offset, claim or defense of
> Borrower or any other party against Lender or against payment of the
> Guaranteed Obligations, whether such offset, claim or defense arises in
> connection with the Guaranteed Obligations (or the transactions
> creating the Guaranteed Obligations) or otherwise.
>
> * * *
>
> Section 2.10   Offset.   Any existing or future right of offset, claim or
> defense of borrower against Lender, or any other party, or against
> payment of the Guaranteed Obligations, whether such right of offset,
> claim or defense arises in connection with the Guaranteed Obligations
> (or the transactions creating the Guaranteed Obligations) or otherwise.
>
> * * *
>
> Section 3.6 Proceedings; Enforceability. * * * Neither this Guaranty nor
> any other Loan Document to which Guarantor is a party is subject to
> any right of rescission, set-off, counterclaim or defense by Guarantor,

including the defense of usury, nor would the operation of any of the terms of this Guaranty or such other Loan Documents, or the exercise of any right hereunder or thereunder, render this Guaranty or such other Loan Documents unenforceable * * *.

{¶52} In addition to these provisions, Section 2.4 of the guaranties provides that Puretz's obligations were not "released, diminished, impaired, reduced or adversely affected" by:

The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that  * * * (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable * * *.

{¶53} These provisions plainly state that Puretz has waived his right to assert any defense against enforcement of the guaranties. Provisions such as these have a similar effect to that of a cognovit note and are generally permissible under the law. "Guaranties that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and

23

unconditional,' have been consistently upheld by New York courts." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Intl.," N.Y. Branch v. Navarro*, 25 N.Y.3d 485, 493, 36 N.E.3d 80, 15 N.Y.S.3d 277 (2015).

**{¶54}** We accordingly find that, based on the provisions set forth above, Puretz is prohibited from challenging the guaranties on the grounds that they are ambiguous. And had Puretz not waived his unconscionability argument by failing to assert it in his answer, these provisions would have barred that argument as well.

### 4. No Genuine Issues of Material Fact as to Puretz's Breach of Guaranties and Resulting Damages

**{¶55}** Puretz next argues that U.S. Bank and Wilmington Trust failed to establish that he breached the guaranties. We are not persuaded. Puretz's liability on the guaranties was triggered after the PE Lima Club West Realty and Alms Borrowers breached the loan agreements. The record clearly demonstrates that the borrowers committed such a breach by, among other actions, failing to give U.S. Bank and Wilmington Trust notice of the public nuisance action. The trial court found as such when entering judgment in favor of the lenders on their foreclosure claims against the Alms and Entowne Borrowers. Following their breach, the borrowers were notified that the lenders were accelerating the balance of the loan.

**{¶56}** At that point, per the terms of the guaranties, Puretz became fully liable for his guaranteed obligations upon the occurrence of a springing recourse event. As set forth above, one springing recourse event specified in the guaranties was:

> if Guarantor (or any Person comprising Guarantor), any Borrower or
> any Affiliate of any Borrower, in connection with any enforcement
> action or exercise or assertion of any right or remedy by or on behalf of

Lender under or in connection with the Guaranty, the Note, the Mortgages or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan.

{¶57} In plain language, this provision states that should Puretz or any of the Alms or Entowne Borrowers assert a defense in any judicial proceeding involving the guaranties, notes, mortgages, or loan documents, Puretz would become fully liable for the unpaid balance of the notes.

{¶58} In the foreclosure action brought by U.S. Bank and Wilmington Trust against the Alms and Entowne Borrowers, those borrowers did just that. They asserted various affirmative defenses in their responsive complaints, opposed the appointment of a receiver, and opposed the lenders' motions for summary judgment. In fact, the occurrence of these events was reflected in the trial court's own docket, where the borrowers filed their answers and their memorandums in opposition to the appointment of a receiver and to the lenders' motions for summary judgment. *See Indus. Risk Insurers v. Lorenz Equip. Co.*, 69 Ohio St.3d 576, 580, 635 N.E.2d 14 (1994) ("It is axiomatic that a trial court may take judicial notice of its own docket."); *Schrock Rd. Mkts., Inc. v. Sun Life Assur. Co. of Canada*, 5th Dist. Delaware No. 11CAE020015, 2011-Ohio-4087, ¶ 24 ("A trial court can take judicial notice of the court's docket."). As a result, no genuine issues of material fact exist as to the occurrence of these springing recourse events.

{¶59} Puretz's failure to pay the remaining balance of the note upon the occurrence of these springing recourse events resulted in his breach of the guaranties, and no issue of material fact exists regarding this breach.

{¶60} Nor do any genuine issues of material fact exist as to the resulting damages suffered by U.S. Bank and Wilmington Trust following Puretz's breach. These damages were sufficiently set forth in Solomon's affidavits, which we have found to be admissible.

{¶61} Having found that no genuine issues of material fact exist, we hold that the trial court did not err in granting summary judgment to U.S. Bank and Wilmington Trust. Puretz's first assignment of error is thus overruled.

### *No Due Process Violation*

{¶62} In his second assignment of error, Puretz argues that the trial court's sua sponte order violated his due process rights by denying him the opportunity to be heard before the trial court granted summary judgment in full.

{¶63} "Due process under the Ohio and United States Constitutions demands that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner where the state seeks to infringe a protected liberty or property interest." *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, ¶ 35, quoting *State v. Hochhausler*, 76 Ohio St.3d 455, 459, 668 N.E.2d 457 (1996).

{¶64} While conceding that the trial court had the authority to reconsider its earlier, non-final judgment, *see Hamilton Ins. Servs. v. Nationwide Ins. Co.*, 5th Dist. Richland No. 03-CA-6, 2003-Ohio-4482, ¶ 18, Puretz contends that his due process rights were violated when the trial court did so without first allowing him the

opportunity to be heard on the issue of damages. Following our review of the record, we find no procedural due process violation.

{¶65} Puretz had a full and complete opportunity to be heard as to both the liability and damages issues raised in the summary judgment motions when he filed responsive memoranda. To the extent he wanted to explore Soloman's testimony via a deposition, he had more than a year to do so prior to the issuance of the trial court's final summary judgment order. Any delay in failing to do so falls on the shoulders of Puretz, not the trial court.

{¶66} Puretz further complains that he did not have the chance to challenge Soloman in court, but trial courts are not required to hold a hearing on a motion for summary judgment. *Capital One Bank (U.S.A.), N.A. v. McCladdie,* 8th Dist. Cuyahoga No. 111289, 2022-Ohio-4082, ¶ 25.

{¶67} Puretz also argues that the trial court was required under Civ.R. 53(D)(4)(d) to rule on his objections to the magistrate's decision, and that the court's failure to do so was a "jurisdictional defect that renders the judgment invalid." He contends that in the absence of a ruling on the objections, the order appealed from is not final and appealable. Puretz's argument is somewhat disingenuous, as he nonetheless appealed the trial court's order and did not make any mention of a lack of finality in his initial brief. In fact, he raised this issue for the first time in his reply brief, in contravention of Loc.App.R. 16.1(C). We nevertheless consider this argument because this court is required to determine our own jurisdiction to hear an appeal.

{¶68} Puretz is correct that Civ.R. 53(D)(4)(d) requires a trial court to rule on pending objections to a magistrate's decision. But we must look at this rule in context. In its entirety, Civ.R. 53(D)(4), which is titled "Action of court on magistrate's decision

and on any objections to magistrate's decision; Entry of judgment or interim order by court" provides that:

(a) Action of court required. A magistrate's decision is not effective unless adopted by the court.

(b) Action on magistrates decision. Whether or not objections are timely filed, a court may adopt or reject a magistrate's decision in whole or in part, with or without modification. A court may hear a previously-referred matter, take additional evidence, or return a matter to a magistrate.

(c) If no objections are filed. If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision.

(d) Action on objections. If one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. Before so ruling, the court may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate.

{¶69} Civ.R. 53(D)(4) contemplates that a trial court will take further action on a magistrate's decision, either by adopting or rejecting that decision in whole or

part, with or without modification. It is for this reason that Civ.R. 53(D)(4)(A) provides that the magistrate's decision is not effective unless adopted by the trial court. Here, the trial court's reconsideration of its earlier ruling on summary judgment obviated its need to take any further action on the magistrate's decision, as well as its need to rule on the pending objections. The entry on reconsideration essentially, for all relevant purposes, rendered the issue that was the subject of the objections moot.

{¶70} Further, this court has recognized that "[a] trial court's failure to comply with Civ.R. 53 constitutes grounds for reversal only if the appellant shows the alleged error has merit and the error worked to the prejudice of the appellant." *Hoffman v. Hoffman*, 1st Dist. Hamilton Nos. C-170640 and C-170641, 2018-Ohio-3029, ¶ 5, quoting *In re Estate of Hughes*, 94 Ohio App.3d 551, 554, 641 N.E.2d 248 (9th Dist.1994). Here, Puretz suffered no prejudice or harm from the trial court's failure to rule on the objections, as we have already determined in our resolution of the first assignment of error that Solomon's affidavits and the referenced exhibits were admissible. For these reasons, the trial court's failure to rule on the objections to the magistrate's decision did not render the entry being appealed non-final.

{¶71} We therefore hold that Puretz was not deprived of notice or of an opportunity to be heard on the issue of damages, and we overrule the second assignment of error. The judgment of the trial court is accordingly affirmed.

Judgment affirmed.

**BERGERON, P.J.,** and **WINKLER, J.,** concur.

Please note:
> The court has recorded its own entry on the date of the release of this opinion.